## LIPPINCOTT and others v. SHAW CARRIAGE Co. and others.

*(Circuit Court, D. Indiana. November 21, 1885.)*

1. BANKING CORPORATION—LOAN—GOOD FAITH.
   Where a loan of money is made by a bank, in the usual course of business, to a corporation, it will not be invalidated by the fact that the president of such corporation and one of the directors thereof is also a state officer and a defaulter, and the officer of the bank negotiating the loan is one of his bondsmen, and has knowledge of the fact that the corporation is negotiating such loan to repay to such president moneys advanced by such president to enable him to settle his account with the state.

2. SAME—STATUTORY REQUIREMENTS—EFFECT ON BONA FIDE LOAN.
   Where a corporation fails to comply with the statutory requirements as to the payment of capital stock, making annual reports, etc., that fact will not invalidate a loan made in good faith, in the usual course of business, to such corporation.

3. SAME—INSOLVENCY—PREFERENCES.
   An insolvent corporation, like an insolvent individual, may give preference to one creditor over another by paying or securing his claim.

4. SAME—DIRECTORS—TO ADVANTAGE OF.
   But preferences given in such a manner as to be of special advantage to the directors or managing agents of such corporation will be set aside.

5. SAME—CHATTEL MORTGAGE—VALIDITY OF.
   The fact that a chattel mortgage includes property recently purchased on credit, in the usual course of business, will not render the mortgage void.

6. SAME—JUDGMENTS—PREFERENCES.
   Where a mortgage is set aside because of invalidity, and the mortgagees held to account, this will not invalidate or affect the priority of judgments and levies taken on notes the mortgage was given to secure.

7. SAME — STATUTES CONSTRUED — SEVERAL MORTGAGES ANNULLED FOR CONSTUCTIVE FRAUD.
   Under Indiana statutes a judgment at law upon a mortgage debt cannot be executed upon the mortgaged property, whether real or personal, even after decree annulling the mortgage for fraud. But if several mortgages upon different properties made by a debtor to preferred creditors are declared illegal, (though not made with fraudulent intent,) a separate judgment theretofore taken upon any of the mortgage debts may be enforced against any property of the debtor not mortgaged to secure that particular debt.

8. SAME — CREDITOR'S BILL — DISTRIBUTION OF FUND — GRANTEES IN ILLEGAL MORTGAGES PERMITTED TO SHARE.
   When preferential mortgages are set aside at suit of creditors for reasons not involving a charge of fraudulent intent or moral turpitude, the mortgagees will be permitted to share *pari passu* in the fund made out of the mortgaged property.

9. PARTNERSHIP—JUDGMENT OR DECREE—ESTOPPEL BY—PARTIES.
   A decree of foreclosure against members of a partnership as such—all the known members not being parties to the suit—does not bind the firm.

10. SAME—FRAUDULENT MORTGAGE—ESTOPPEL—PRACTICE.
    An intervening creditor, whose claim was filed and sent to the master to report upon, and such creditor had been made party to a foreclosure proceeding and had suffered judgment to go against him by default, will be estopped to deny the validity of the mortgage; and, the proof having been duly made before the master, the court will allow an answer showing the fact to be filed after the filing of the master's report.

In Equity. Exceptions to master's report.
*Horace Speed* and *Harrison, Hines & Miller*, for plaintiffs.
*Claypool & Ketcham*, for defendants.

Woods, J. A particular statement of the numerous exceptions filed by the parties is not deemed necessary here. Omitting many details of evidence, I give so much of the master's report as is thought to have an important bearing upon the questions to be decided. Except in some particulars which will be indicated, the facts of the case as stated by the master are well supported by the evidence. The report is as follows:

The bill was filed by Ezra Lippincott and others, merchants, in behalf of themselves and all other creditors who might come in and pay their share of the costs, etc., against the Shaw Carriage Company, the First National Bank of Indianapolis, Benjamin C. Shaw, Irwin Robbins, Thomas C. Redding, William B. Redding, F. A. W. Davis, trustee, William H. Morrison, trustee, F. A. W. Davis, John L. Ketcham, Jane M. Ketcham, William H. Morrison, Samuel Miller, William Needham, Peter Ditmars, Peter J. Banta, partners under the firm name of the Indiana Banking Company, William J. Holliday, John W. Murphy, James F. H. Tompkins, and George Tousey. The object and prayer of the bill is to set aside certain alleged preferential mortgages executed by the defendant the Shaw Carriage Company to the defendants the First National Bank of Indianapolis and the Indiana Banking Company, and also to set aside certain mortgages executed by the respondent Shaw individually to F. A. W. Davis, as cashier of the Indiana Banking Company, on or about the seventh day of May, 1879, on the ground that they were without consideration, and were fraudulent and void.

The evidence discloses the following facts:

In December, 1873, the Shaw Carriage Company was incorporated. * * * In January, 1879, Shaw, who had been treasurer of state of the state of Indiana for four years, and whose term would expire February 8, 1879, was a defaulter to the amount of, say $127,000, which he had used, or appropriated to his own use, in his own business, contrary to law. As the time approached for settlement he made efforts to make good his deficit. Early in January he applied to the banks of Fletcher & Sharpe and Woollen, Webb & Co., of Indianapolis, and obtained for the company loans of $30,000,—$20,000 from Fletcher & Sharp, and $10,000 from Woollen, Webb & Co.,—and about the same time procured a loan of $10,000 from the Meridian National Bank for the company. He obtained these loans upon a statement that the company had been or was about to be pushed or crowded by the Indiana National Bank, where it had formerly kept its account, by the new management which had succeded Mr. Tousey, the former president, and that he desired the money to enable him to close the company account with that bank. This was not true; the amount the company owed the Indiana National Bank at that time was nominal, if anything. The plain motive for obtaining these loans was to enable him to settle his account as treasurer of state. He still lacked over $80,000 to enable him to settle with the state.

The defendants Davis and Robbins, and Mr. Franklin Landers, who is not a defendant, were among the sureties on his official bond, and the evidence shows that they all knew that Shaw was short in his accounts with the state to a large amount. Landers, who assisted Shaw in making his settlement, indorsed his note for $5,000. He says he talked with Davis about the deficit, and about settling it up. Shaw says he talked with Landers and Robbins about it. To enable Shaw to raise the balance needed, Robbins, treasurer of the company, made the notes of the company payable to Shaw and Robbins, which were indorsed by them before delivery. These notes amounted to $82,000, and were negotiated on February 5th and 8th, at the Indiana Banking Company's bank, for certificates of deposit for that sum, which were made payable to the Shaw Carriage Company. In that transaction Davis

acted for the Indiana Banking Company, and knew that the object was to enable Shaw to raise money with which to settle with the state.

The evidence also shows that of these notes about $14,000 was accommodation paper, in excess of any indebtedness of the company to Shaw. This accommodation paper was taken up by Shaw, May 7th or 8th, by his returning to the carriage company its own paper on the hands of the Indiana Banking Company, having given his individual paper, secured by mortgage on his individual property, in payment thereof. With a view to this loan there had been prepared a statement of the company's condition, its assets and liabilities, which was exhibited by Robbins to Davis in January, 1879, by which it appeared that Shaw claimed, as due him from the company, $102,000. By that statement the assets of the company were put at $227,000; consisting of $72,000 for the factory and machinery on Gatling street, in the city of Indianapolis, $61,000 of work done and in course of construction, and $68,000 of raw material, and the balance notes, accounts, etc. According to the testimony of Davis that statement showed over $140,000 of valuable assets, which he believed could be converted into money in a short time, consisting of the following items:

| | |
|---|---:|
| Building and warerooms, | $66,300 |
| Materials and lumber, | 61,956 |
| Accounts, | 2,489 |
| Notes, | 9,213 |
| Cash, | 147 |
| | $140,105 |

This, it will be seen, differs about $20,000 from the statement as given by Robbins of the condition of the company as it existed in the May following. Mr. Davis says that at the same time Mr. Shaw stated to him that he (Shaw) was worth $150,000. From January to May the company purchased $12,000 of raw material, and the first appraisement or inventory made after the mortgages were executed, and the receiver took possession, put the value of the whole property at $115,000. The January statement showed $169,000 of debts, most of which was due to Shaw, or on time loans by banks.

The evidence shows that part of the notes making up the amount of $82,000, which were discounted by the Indiana Banking Company on the fifth and eighth of February, were payable on demand,—a form of paper that the company had never before executed in its bank dealings. Mr. Robbins says he has no idea why they were so made; and in view of this fact, and of the condition of the company as shown by the statement made in January, it is difficult to believe that these notes were discounted in the ordinary course of banking business.

Upon the whole evidence, the master is constrained to believe that the motive of the entire transaction, on the part of the banks as well as Shaw, was not to raise funds to assist the company in carrying on its business, but to provide a way by which Shaw might escape the disgrace and punishment which might result from the exposure of his manner of dealing with the public funds. In March or April, 1879, $17,000 of the $82,000 of notes discounted by the Indiana Banking Company were transferred by the Indiana Banking Company to the First National Bank of Indianapolis without indorsement. In March, 1879, some of the other notes held by the Indiana Banking Company against the Shaw Carriage Company became due, and were neither paid nor renewed, nor was any payment or renewal requested. In April other notes of the same character, and held by the same bank, became due, which were treated in the same way.

Shaw testifies that in March, or early in April, he saw that the estimate of the company's property, as made in the January statement to the bank, was

greatly in excess of its true value, and he immediately informed Mr. Davis
and Mr. Morrison of that fact, Mr. Morrison at that time being president of
the First National Bank. In the conversation he told them, he says, that*
the carriage company could not run any longer unless they would help it, or,
as he says, "see it through," and would not press the company for their
debt; and that after a full discussion, and knowing the facts, they told him
that they knew the situation, and to go ahead and they. would see the com-
pany through, and relying on their promise he went on and bought goods as
before.

The company's books show that during the year 1878 the purchases of
merchandise were $16,000, upon which they paid $9,000. In the four months
and seven days of 1879 the company purchased $12,000 of merchandise, and
paid $1,000 on it. The loan from the banks and other debts all, or nearly
all, came due in May, 1879, or earlier; and, so far as the evidence discloses, no
effort had been made, and no means devised, to meet these maturing liabilities.
From the course of business in such manufactories, the company could not
begin to realize upon the year's business until after May, and there was no
possibility of its continuing as a going concern without the indulgence of its
creditors. It is said in explanation that after Shaw retired from his office
he intended to extend the business of the company, and expected to make 400
carriages and 1,000 wagons during the year 1879. He promised to give the
business his time and personal attention thereafter, something he had not
done while in office, and it was expected there would be a revival from the
business depression which had existed since the panic. How the business
was to be extended without money it is difficult to understand. It is clear
from the evidence that from January, 1879,—certainly from and after Febru-
ary 8, 1879,—the concern had neither assets nor credit sufficient to enable it
to continue in profitable business. It was a financial wreck, and the master
has no doubt from the evidence that Shaw and Robbins and Davis knew it to
be hopelessly insolvent soon after the execution of the notes in February, if
not at that time.

It appears that soon after the transaction of February 5th and 8th, in which
the Indiana Banking Company discounted the $82,000 of notes, the stock-
holders of the Indiana Banking Company became alarmed, and insisted that
that loan should be secured. Mr. Davis made a demand for security. Mr.
Robbins visited him at his house where he was ill, and declared they must
have time, and could pay every dollar. It is barely possible that Mr. Robbins
entertained that opinion, but he certainly had no sufficient ground upon which
to base it. Mr. Davis promised him that if they gave the mortgages the bank
would further assist them, he says, but cannot say whether the mortgages
were given on the faith of this promise or not. After this interview with
Davis, and the demand for the mortgages, there was a meeting of the board
of directors, at which Shaw, Robbins, and the two Reddings were all present.
They all took part in the proceedings, and voted on the question as to whether
the mortgages should be executed. Shaw and Robbins were directed to exe-
cute and deliver the mortgages to the banks upon all of the company's prop-
erty of which schedules had been prepared, the intention being to cover ev-
erything that the company owned. These mortgages were executed and
acknowledged on the seventh and eighth of May, according to the testimony
of Mr. Robbins; and the same days Shaw mortgaged all his individual prop-
erty to the Indiana Banking Company for $50,000.

Mr. Spahr, who was the attorney of the corporation, was consulted as to
the mortgages two or three days before they were made, and as to the action
of the board of directors in ordering their execution and delivery to the bank.
Mr. Spahr was also the attorney for Mr. Robbins, who had interests adverse
to the company. These mortgages provided that the mortgagees should take
the immediate possession of the property, and make sales and apply the pro-

ceeds on their debt. After making the mortgages the company remained in-exclusive possession of all the property until May 13, 1879, selling goods as before, and not accounting for the proceeds. The amount of these transactions, however, was not large, not exceeding, probably, $2,000. From the thirteenth day of May to the end of the month it is a matter of doubt whether the mortgagor and mortgagees did not have concurrent possession of the property; the evidence does not make this clear. The banks (mortgagees) took possession May 13th; the mortgage was recorded that day, and a new chattel mortgage was then made to secure other notes, and this was recorded the next day. The directors of the company, who were also its officers, were employed by the mortgagees for some months. In July, 1879, a receiver for the mortgaged property was appointed by the superior court of Marion county under the mortgages upon application of the mortgagees.

It may be stated that in all these transactions Davis was the cashier of and a partner in the Indiana Banking Company, and in making the demand for the mortgages he was acting for the Indiana Banking Company and the First National Bank also; that Mr. Morrison, during these transactions, was president of the First National Bank, and also a partner in the firm known as the Indiana Banking Company; and that during these transactions the Indiana Banking Company owned a majority of the stock in the First National Bank. The complainants who sold to the Shaw Carriage Company merchandise in March, 1879, had been dealing with the company for many years, and supposed it at the time to be solvent. They obtained judgment for the sum stated in the bill, and *nulla bona* was returned upon the execution issued on the judgment.    *    *    *

As has been seen, the indebtedness of the company to him (Shaw) grew until it reached the large sum for which notes were given in February, 1879, to enable him to make his settlement with the state. It has been insisted and argued with a good deal of force that there was no foundation in fact for this supposed indebtedness of the company to Shaw; and while it is clear that through mismanagement or incompetency or dishonesty on the part of some of its officers or employes, there were heavy losses which have not been explained, and have not been located by the testimony, except that they were, no doubt, owing, in part, to a general depreciation in value, resulting in a falling off in the demand for fine carriages, such as the company made, and the general depression of business. The probabilities arising from a view of the whole evidence tend to the conclusion that Shaw had been liberal in lending money to the failing concern, and that the basis of his notes were actual moneys taken from the state treasury and given to Robbins to be used in the business.

It appears from the accounts that he was allowed interest at the rate of 10 per cent. per annum when that was the ruling rates at the banks, and 8 per cent. when that was the ruling rate, and that interest was compounded annually on the loans made by him, and that such compound interest entered into and formed a part of the notes.

A great deal of expert testimony was taken, in which the complainant undertook to show that the Shaw claim was fictitious, and while the examinations showed abundantly the incompetency and carelessness of the bookkeeper, it is insufficient to impair the force of the evidence that Shaw did in fact loan the company the money for which the notes secured by the mortgages to the banks were given. During all the years of the company's existence Shaw was the president and a director of the company, and its largest and most influential stockholder; and he must have known, or should have known, that the accounts of the company with him were kept in this irregular manner. His reason for making no complaint is obvious. As has before been stated, it was known to all the parties concerned that the object of giving Shaw the notes of the corporation, and having them discounted, was to

enable him to settle his accounts with the state, that he might avoid the exposure and disgrace that would follow if he failed to raise the money.

In view of these facts, and of their knowledge of the relation which Shaw and Robbins sustained to the company, are the banks entitled to hold the preferences which the company attempted to give them by the execution of the mortgages? Mr. Davis, as cashier and a partner in the firm of the Indiana Banking Company, and as agent of the First National Bank, had knowledge that the money which he was asked to loan was needed to pay Shaw's alleged claim against the carriage company, and was not to be used in carrying on the business of the company. He also knew from the statement which had been exhibited to him in January, showing the amount of the company's indebtedness, that that debt was very large.

With the knowledge possessed by Davis, the master is of the opinion that he, and those for whom he was acting, could not receive such paper as this, executed by an embarrassed if not insolvent corporation to its own president and director, for so large an amount, in good faith. The form of the notes executed by the company was sufficient to put the banks on inquiry, even if no other notice had been proved. Counsel for complainant cite upon this point the following authorities: *West St. Louis Savings Bank* v. *Shawnee Bank*, 95 U. S. 557; Daniel, Neg. Inst. §§ 282, 1611; *Claflin* v. *Farmers' Bank*, 25 N. Y. 293; *New York Iron M. Co.* v. *First Nat. Bank*, 39 Mich. 644; *Wilbur* v. *Lynde*, 49 Cal. 290; *Thomas* v. *Brownsville, etc., Ry. Co.*, 1 McCrary, 292; S. C. 2 Fed. Rep. 877; *First Nat. Bank* v. *Gifford*, 47 Iowa, 575.

In the light of these authorities it seems to the master that the holders of these notes stand precisely as they would have stood had these notes not been payable in bank,—had simply been assignees of Shaw's claim against the company.

It is insisted further by the complainant that the debt was not a valid debt against the creditors, because the officers of the corporation and directors have totally disregarded the requirements of the statute. *First.* They failed to fix the amount of the capital stock, as required by section 3857, Rev. St. *Second.* The capital stock was not paid in within 18 months after the incorporation. Section 3859. *Third.* No certificate of such payment was filed, as required by section 3861. *Fourth.* There was a failure to make the annual reports required by section 3863. There was also a failure to certify the reduction of capital, as required by section 3862.

Under these and other provisions of the statute, it is claimed that a personal liability was created in favor of the creditors against the directors, and that no director of the company who participated in or allowed these failures of duty on the part of the board of directors or officers can have any claim against the assets of the corporation, in his own favor, as against other creditors.

As has been seen, the demand made by Davis for the execution of the mortgages was very promptly complied with. It cannot be pretended that these mortgages were given with a view to the further continuance of the company in business. The mortgages themselves provided that the mortgagees should take immediate possession of all the mortgaged property, which was intended to comprise all the property and assets of the corporation, and should sell the same, and apply the proceeds on the notes held by them. To have left the mortgagors in possession, with power to carry on the business, would have *vitiated* the mortgage. To have insisted upon the terms of the mortgage by the taking of possession, would have amounted, of course, to immediate destruction of the business. So far as the corporation itself was concerned, it would be absolutely without credit, and without money or material to enable it to carry on its operations. Of course, Robbins and Shaw knew this. Shaw says himself that he supposed that when a man took a

mortgage of that kind he took it with the view of enforcing it. Robbins says the mortgage was given to cover all their property, and keep their other creditors from annoying them. It certainly cannot be the law that the directors of a corporation in such condition, standing as they did, in the light of the authorities, as trustees for the creditors, and knowing that the concern was absolutely and hopelessly insolvent, can execute valid preferential mortgages, such as those in controversy in this case. Shaw and Robbins knew before they voted for the resolution authorizing the execution of the mortgages that the company was hopelessly bankrupt. The authorities are uniform to the effect that when directors know this to be the state of the corporation's affairs, they are, from the moment they have that knowledge, trustees for the creditors. Certainly, one standing in such a relation cannot prefer himself, as Shaw attempted to do, by securing the notes which had been given for his own benefit.

I report and find that the allegations of the bill charging that the mortgages were executed in fraud of the creditors, with a full knowledge of the facts by both the directors and mortgagees, are sustained by the evidence, and I therefore recommend a decree in accordance with the prayer of the bill.

Respectfully submitted,         WILLIAM P. FISHBACK, Master.

The complainants claim that the last clause of the report is a general and unqualified finding by the master, as matter of fact, "that the mortgages were executed in fraud of creditors," as charged in the bill:

Upon the entire report it seems more reasonable to consider this clause as a statement of legal conclusion from the facts set forth in the report. It is expressly stated in the report that "it cannot be pretended that these mortgages were given with a view to the further continuance of the company in business;" and no other pretense of an actual fraudulent intent to cheat, hinder, and delay creditors finds reasonable support in the facts and circumstances as reported by the master. The fair deduction from the report, as it seems to me, is that the loans in question, made by Davis as cashier, were made upon the faith of the January statement in respect to the property and condition of the carriage company; and when afterwards the incorrectness of that statement was discovered and made known by Shaw, and the partners of Davis in the banking company became alarmed, it was quite natural that Davis, notwithstanding the promise which he and Morrison had given of further aid to the carriage company, should demand security, and that the directors, especially Shaw and Robbins, should feel constrained to yield to the demand.

The contrary argument is made that Davis, as a surety upon the official bond of Shaw to the state, was moved by personal rather than business considerations to make the loan; but it does not appear that his liability as bondsman, if Shaw had remained in default, could have been for more than a fourth or fifth of the sum which he loaned, and consequently it is not to be presumed that the loan was made for the purpose of extinguishing this personal liability; and, aside from this, no motive is shown or suggested why Davis should have sacrificed knowingly the interests of the banking company, of which he was a member, for the benefit of Shaw. However improvident as shown

by the event, the loans must be deemed to have been made by Davis in good faith as a business transaction.

In another respect the master seems to me to have misapprehended the motive and character of these loans. He has reported the facts correctly enough, but has treated them as showing a *discount* by the banking company of notes made by the carriage company to Shaw, in evidence of the latter company's indebtedness to Shaw, except for the sum of $14,000, which was in excess of that indebtedness; and to that amount the master has regarded the notes as accommodation paper given for the benefit of Shaw. The plain legal effect of the transaction, however, is that the carriage company was the borrower from the banking company, and in order to give Shaw and Robbins as its indorsers, made its notes to them—they thereby becoming nominal payees and indorsers for the accommodation of the maker—and delivered the notes made in this way directly to the lender, and received thereon the certificates of the banking company for the amount of the loan.

No question has been made, nor, as I suppose, can well be made, of the right of a corporation, which has power to borrow money, to make its notes in this way; and that, when so made, they should be treated as having the same force as if the lender of the money had been named as payee, and the name of the indorser appeared only upon the back of the paper. The transaction viewed in this light, it is not material what the form of the paper in question was in respect to negotiability by the law-merchant, and there is no question in the case whether or not an assignee of the notes was put upon inquiry. The banking company is not an assignee in any proper sense, but the payee, who itself delivered directly to the maker the full consideration. And for the same reason it is not true "that the holders of these notes stand precisely as they would have stood had they simply been assignees of Shaw's claim against the company." Shaw's claim was in no sense or degree the consideration of the notes, and, in my judgment, the facts or disputes connected with that claim are of much less significance than is given them in the master's report. It is immaterial in respect to this case, as the facts are shown to be, that Shaw was a defaulter, and desired to escape exposure and criminal prosecution or penalty, and that Davis desired or was willing to help him. The carriage company was indebted to Shaw for his or for the state's money. It was bound to repay him, and for that purpose had a right to borrow money, and Davis had a right to lend it; and, so far at least as Davis and those for whom he acted are concerned, it may be conceded that his motive, in part, was "to provide a way by which Shaw might escape disgrace and punishment;" yet it does not follow, nor does it seem to me true and fair upon the evidence to say, "that the motive of the entire transaction upon the part of the banks, as well as of Shaw, was not to raise funds to assist the company to carry on its business." It was proper part of "carrying on its business" to pay its debts, and the fact that Shaw and his

friends were under the pressure of an unusual motive for seeking payment, in no sense impairs the validity of the loan by which the necessary money was obtained. If, under the circumstances, and knowing for what purpose the money was being borrowed, Davis was put upon inquiry concerning the existence and validity of the alleged debt to Shaw, and if it were conceded that the validity of the loan, as against the carriage company, could be affected by the result of that inquiry, it is enough for this case that the master has found that the indebtedness to Shaw was real to an amount only $14,000 less than the amount of the loan; and that excess Shaw made good to the carriage company in a short time by taking up its notes to the banking company and giving his own instead. This fact, it may be remarked, furnishes a probable explanation of the giving of notes by the carriage company to the banking company, "payable on demand," concerning which the master has found it difficult to believe that they "were discounted in the ordinary course of banking business."

It is insisted, however, that, by reason of the failure to comply with the statutes of the state in the particulars mentioned by the master, Shaw, as a director, was personally responsible for all indebtedness of the company, and, until such indebtedness was paid, had no right to claim repayment of what he had loaned to the company. Conceding, for the sake of the argument, that this is true, though, as will be seen, the fact was different, it does not, in my judgment, affect the validity of the notes given by the carriage company for the loan made by the banking company. No authority has been cited to the effect, and I do not think it can be true, that the lender of money to a corporation, under such circumstances as are shown in this case, or upon any ordinary state of facts, can be bound to inquire whether or not such statutory requirements have been complied with. It seems to me doubtful whether Davis, merely because he knew that the money was to be used in paying the company's debt to Shaw, was bound to inquire into the truth of that indebtedness; but to hold that the duty extended further, and to such remote liabilities as suggested, would, as it seems to me, be unreasonable. Such a rule would tend to cripple rather than to promote the operations, and usefulness of such corporations.

The fair and reasonable inference from all the facts is that the indebtedness of the carriage company to the Indiana Banking Company and its assignee, the First National Bank of Indianapolis, was contracted in good faith, and consequently that the notes made in evidence of it are all unimpeachable obligations. And it is from this starting point that we must proceed to the inquiry whether or not the mortgages in question constitute valid securities. It is not improper to remark, however, that some of the notes secured by these mortgages had their consideration in loans made, unquestionably in the due course of business, long before the loan of $82,000 was made. The real question, therefore, is whether or not the preference given,

or attempted to be given, is invalid because *Shaw* and *Robbins*, who were two of the four directors of the carriage company, and acted with their associates in ordering the execution of the mortgages, were liable as indorsers upon the notes secured thereby.

The weight of authority seems to be in support of the affirmative of this proposition. For, while it is generally conceded that a corporation, notwithstanding insolvency, continues possessed of a general power of management of its affairs, and like natural persons may give preferences by way of payment or security to one creditor or class of creditors over others; yet, in close analogy to the rule which forbids the giving of preferences by individual debtors for the purpose of securing, or in such manner as to secure, advantage or benefit to themselves, and in manifest accord with the tendency of judicial opinion as expressed upon consideration of kindred questions, it has been decided in a number of cases that preferences given by insolvent corporations in such manner as to be of special benefit to the directors or managing agents, or any of them, will be set aside. This, as it seems to me, is the salutary rule, and the only rule which can be administered with uniformity and fairness. Indeed, it has been often said by judges, including those of the federal supreme court, that the property of an insolvent corporation is a trust fund, and the directors trustees for the creditors; and, if this were strictly so, it is manifest that no preferences whatever could be allowed between creditors standing in the same relation to the fund. These statements are, however, true in a qualified sense, and lead logically, if not necessarily, to the conclusion that in such cases the directors, if they give preferences, must do it unbiased by considerations of personal advantage or gain. In some of the cases in which the question has recently arisen, the subject has been so fully considered upon authority and principle as to make a further discussion or review at this time unnecessary. The following cases are all, in some degree, relevant, and a few of the first named, directly in point: *Bradley* v. *Farwell*, 1 Holmes, 433; *Corbett* v. *Woodward*, 5 Sawy. 403; *Stout* v. *Yaeger*, 4 McCrary, 486; S. C. 13 Fed. Rep. 802; *Trustees* v. *Bosseiux*, 3 Fed. Rep. 817; *Coons* v. *Tome*, 9 Fed. Rep. 532; *Richards* v. *New Hampshire Co.*, 43 N. H. 263; *Duncomb* v. *Railroad Co.*, 88 N. Y. 1; *Hopkins' Appeal*, 90 Pa. St. 76; *Robins* v. *Embry*, 1 Smedes & M. 207; *Curran* v. *Arkansas*, 15 How. 304; *Koehler* v. *Black River F. I. Co.*, 2 Black, 715; *Drury* v. *Cross*, 7 Wall. 299; *Railroad Co.* v. *Howard*, Id. 392; *Sawyer* v. *Hoag*, 17 Wall. 610; *Jackson* v. *Ludeling*, 21 Wall. 616; *County of Morgan* v. *Allen*, 103 U. S. 498; *Scovill* v. *Thayer*, 105 U. S. 143; *Patterson* v. *Lynde*, 106 U. S. 519; S. C. 1 Sup. Ct. Rep. 432; *Cook Co. Nat. Bank* v. *U. S.*, 107 U. S. 445; S. C. 2 Sup. Ct. Rep. 561; *Osgood* v. *King*, 42 Iowa, 478; *Goodin* v. *Cincinnati, etc.*, 18 Ohio St. 182; *Swepson* v. *Bank*, 9 Lea, 713; *Marr* v. *Union Bank*, 4 Cold. 486; Tayl. P. Corp. §§ 6, 12, 634, 668, 759; *Emporium R. E. Co.* v. *Emrie*, 54 Ill. 345. Cited by defendants to the contrary: *Planters' Bank* v. *Whittle*, 18 Re-

porter, 568; *Buell* v. *Buckingham,* 16 Iowa, 284; *Gordon* v. *Preston,* 1 Watts, 385; *Railroad Co.* v. *Claghorn,* 1 Spear, Eq. 545; *Whitwell* v. *Warner,* 20 Vt. 452; *Sargent* v. *Webster,* 13 Metc. 497; *Ashurst's Appeal,* 60 Pa. St. 290; *Catlin* v. *Eagle Bank,* 6 Conn. 233; *Smith* v. *Skeary,* 47 Conn. 47; *Savings Bank* v. *Bates,* 8 Conn. 504; *Pondville Co.* v. *Clark,* 25 Conn. 97; *Ringo* v. *Biscoe,* 8 Eng. (Ark.) 563; *Dana* v. *Bank U. S.,* 5 Watts & S. 223.

These cases last cited unquestionably contain irreconcilable *dicta,* and some of them are based upon inconsistent reasoning, perhaps; but that the decisions are in necessary conflict with the doctrine declared in the other cases is not so clear. For instance, in respect to the cases of *Buell* v. *Buckingham, Railroad Co.* v. *Claghorn,* and *Planters' Bank* v. *Whittle,* (decided by the supreme court of Virginia,) which are claimed to be directly opposed to the doctrine in question, it may be said of the first, in the language of one of the justices who joined in the decision, "that there is no evidence that the corporation is insolvent, nor is there any evidence that all of the property of the corporation was taken;" and, of the other two, that the preferences were given in fulfillment of agreements to indemnify the directors, who, upon the faith of such agreements, had assumed liabilty for or given credit to their respective corporations. In other cases the preferences were given to stockholders who were not directors or managers.

It was insisted by the complainants, in another connection, that Robbins and Shaw, as directors of the carriage company, became personally liable for all debts of the company, because a certificate of the reduction of capital stock was not recorded as required by the statute of the state. Rev. St. 1881, § 3862. The defendants, seeking now to avail themselves of this proposition, assert that the preferences given could be of no benefit to Shaw and Robbins individually, and were therefore free from objection, because they were bound personally for all debts of the company alike. The fact, however, is not as assumed, and of course the conclusion fails. By the statute, reductions of capital stock in such companies can be made only at meetings of stockholders. The reduction attempted in this instance was made at a meeting of directors. The failure to record, therefore, was of no consequence.

It is quite clear, I think, that the plaintiffs are not estopped or bound by the decree of foreclosure of the mortgages in dispute, rendered in the superior court of Marion county. *Russell* v. *Place,* 94 U. S. 606; *Cromwell* v. *County of Sac,* Id. 351; *Davis* v. *Brown,* Id. 423; *Insurance Co.* v. *Broughton,* 109 U. S. 121; S. C. 3 Sup. Ct. Rep. 99; *Homer* v. *Brown,* 16 How. 354.

The question whether or not any of the intervening claimants are so bound by that decree as to exclude them from the benefits of this suit is reserved for future determination.

Nothing is shown in the case to affect the validity of the mortgages made by Shaw of his individual property; but, for the reason

stated, the mortgages made by the Shaw Carriage Company to secure its indebtedness to the Indiana Banking Company and to the First National Bank must be declared invalid as against the plaintiffs and general creditors, and the mortgagees held to account. The orders now made shall not be deemed to preclude the defendants from sharing *pro rata* in the final distribution. Ordered accordingly.

The foregoing opinion, submitted to counsel some months ago, has been withheld until questions concerning the respective rights of the parties in such fund as may be for distribution under order of the court could be considered, and the details of the decree defined. The argument upon these questions has now been made, embracing upon either side so many propositions and citations of principles and authorities as to preclude an attempt to restate and analyze them here. Little, if anything, beyond a statement of conclusions can be given. Preliminary, however, to a decision of the questions yet open, the court is urged to reconsider the reasons for annulling the mortgages in question; counsel for the plaintiffs insisting that, in addition to the ground stated in the opinion, the record shows a cause of actual and intended fraud, which ought to exclude the mortgagees from sharing in the fund.

In this connection, and for a better understanding of some matters to be considered, it is proper to give a fuller synopsis of the plaintiffs' bill than is found in the master's report. The plaintiffs, as creditors who in May, 1880, had obtained judgment and execution, which had been returned *nulla bona*, "bring this, their bill, in behalf of themselves and all other creditors who may come in and pay their share of the costs," and charge; that in May, 1879, in pursuance of a conspiracy to cheat, hinder, and delay creditors, the defendant the Shaw Carriage Company executed, and other defendants received, mortgages upon all the property, real and personal, of the carriage company, to secure the payment of notes made without lawful consideration; that in May, 1879, judgments were taken upon some of these notes by the respective holders in the Marion county superior court, and executions thereon issued and levied by the sheriff upon goods of the carriage company, and sales made, of which the proceeds were paid over to defendants to the amount of $25,000; that in July of the same year, upon the application of Davis and Morrison, and the First National Bank, the said superior court appointed William Rame a receiver to take charge of, manage, and sell certain of the mortgaged goods and chattels aforesaid, and to pay the claims of said mortgagees as preferred and prior claims; that the receiver made sales, and received and paid over to the mortgagees moneys to the amount of $30,000; and that in September, 1879, judgments were taken in the same court upon the other notes, or some of them, by the respective holders.

The prayer of the bill is that the notes, mortgages, and judgments be all set aside and held for naught; that a receiver be appointed to

take charge of all the property, real and personal, of the carriage company, (not taken by the receiver and sheriff of the state court,) with authority to sell under the orders of this court, and from the proceeds, after paying expenses, to pay the debts due to plaintiffs and such other creditors of the carriage company as will come in under the bill; that the First National Bank, Morrison, Davis, and partners, be declared to be trustees for the plaintiffs and other creditors of all funds, property, and assets of the carriage company received under said judgments, mortgages, sales, or from the sheriff or receiver of the state court, and that they account to this court for all moneys, lands, goods, and chattels by them or any of them received or to be received, etc.

The argument now made in support of the charge of fraudulent intention is predicated mainly upon the fact that the chattel mortgages were made to include goods which were bought and brought into the establishment after the interview in which Shaw told Morrison and Davis that without the aid of their banks the carriage company could run no longer, and they replied "that they knew the situation, and to go ahead and they would see the company through." It appears, too, that when the mortgages came to be drawn, Col. Shaw protested earnestly against including goods recently purchased, but Davis and Morrison insisted on it as a legal right. The sellers of some of these goods have intervened in the case, claiming the benefit of the original bill; but, it is to be observed, not charging in their petitions that any fraud in this special respect was perpetrated upon them. Counsel, however, insist that, in respect to these creditors, the transaction was a moral as well as legal fraud, which operates to the benefit of other creditors, in respect to the right of relief, the same as for those who were directly injured.

If it were conceded, as in the argument it seemed to be assumed, that the promise of Davis and Morrison to Shaw was made in bad faith, and that the real purpose on their part and on the part of Shaw was only to keep the concern going until more goods could be obtained on credit and covered by these mortgages, there could be but one opinion about the matter. But a fraud so gross as that would be is not to be lightly imputed. The proof of it, to be convincing, should be of strength proportioned to the enormity of the charge.

It is nowhere alleged, nor is there believed to be any evidence in the case, that these creditors were induced to sell their goods by any false representation or concealment in respect to the solvency or financial responsibility of the carriage company; and it is not pretended that they knew of or relied upon the promise which Davis and Morrison had given to Shaw. Indeed, for all that is averred or shown, they may have had full knowledge of the condition of the carriage company, and may have been, like Davis and Morrison, willing to give it credit and to help "see it through." To say the least, unless they were induced to sell their goods by misrepresentation, or fraud-

ulent concealment of fact; or unless, the insolvency of the carriage company being unknown to them, Shaw purchased the goods with the intention not to pay for them, the purchase was valid; and the goods having come into the possession of the company were subject, like its other property, to any lawful disposition. Especially is this so in respect to this action, for the reason that even if these creditors might (on proof of all the facts) have rescinded the sales and reclaimed the goods, as against both mortgagor and mortgagees, they have proceeded upon a different theory, and by coming into this case have confirmed the title acquired by the carriage company. This is so because the bill under which they have intervened, in effect, if not in terms, charges that the mortgaged chattels were the property of that company when the mortgages were made.

The court is not to be understood here as meaning that this technical waiver of fraud, if there was fraud in the sale, which might have affected the title passed, should be deemed to limit or modify the effect of that fraud as an item of evidence upon the question whether or not the mortgages afterwards placed upon the goods were made in pursuance or in accomplishment of a fraudulent intent.

There is, however, no proof to warrant the inference that the goods were purchased with the intent to put them in the mortgages. That Col. Shaw had no such intention is clear, and his intention stood for that of the carriage company; and in respect to Davis and Morrison, who represented the mortgagees, as already remarked, it cannot, upon the evidence, be fairly said that their promise to Shaw was not made in good faith, and in the expectation that, with the aid which they promised and intended to lend it, the company would be able to surmount its embarrassments. When afterwards they changed their purpose, as they were constrained to do by others interested with them, and insisted upon mortgage security embracing the goods obtained of these creditors, they based their demand, not upon any previous understanding or conspiracy with the officers of the carriage company, but upon an assertion of legal right.

If a promise so made to an embarrassed company to continue to give it aid and credit for the honest purpose of helping it over difficulties, reasonably supposed to be not insuperable, puts it out of the power of the promisor, as against others who shall thereafter have given credit to the same debtor, to receive a preferential security, which, but for the promise, he might rightfully have demanded or accepted, it is difficult to see upon what principle it is so. Such a promise, unless it goes to the extent of creating a partnership or joint interest, certainly has no binding force in law, even in favor of the party to whom it is made; and if, when given in good faith, it can be deemed good cause in equity for denying to the promisor the right to obtain a preference over other creditors who thereafter give credit,—a proposition which seems to be very doubtful,—this effect could hardly be deemed to extend to other creditors; and, if even this

were conceded, it must be on grounds of public policy, involving necessarily no charge of fraud other than of a purely constructive character.

The chattel mortgages each contain a clause whereby the mortgagees are authorized to sell finished goods at private sale, and work the stock and material on hand into finished articles, and sell the same in like manner, provided that, without the consent of the mortgagor, such sales shall not be for less than market prices; and these provisions, it is insisted, make the mortgages, as against other creditors, illegal and fraudulent. But, if so, manifestly they do not afford ground for inferring a willful or purposive fraud on the part of either mortgagor or mortgagees. If, therefore, it were conceded that there are other grounds than that first stated for setting these mortgages aside, there would be in the case no additional element of fraud which could affect differently the respective rights of the parties.

But it is said that the defendants have insisted upon maintaining their illegal advantage, and to that end have imposed upon the plaintiffs a protracted and expensive litigation, and consequently ought to be postponed or excluded from sharing in the distribution. There is little force in this. If the plaintiffs had moved for judgment upon bill and answer, without a word of additional evidence, except, perhaps, to show the insolvency of the carriage company, they might have had at once the same decree which will now be awarded. The protracted struggle in respect to the facts of the case has been over charges of actual frauds and conspiracies to cheat, which have not been proved.

The plaintiffs advance the further proposition that the judgments obtained by the First National Bank and the Indiana Banking Company, upon their respective notes against the carriage company, must also be annulled and set aside, so far, at least, as they may be claimed to be liens upon or constitute a basis of preference in respect to property embraced in any of the mortgages; that the judgments so obtained were cumulative securities, taken in aid of illegal and invalid mortgages, and cannot bind the mortgaged property until the mortgages shall have been released or abandoned. Reference on this point is made to *Mackie* v. *Cairns*, 5 Cow. 547; *D'Ivernois* v. *Leavitt*, 23 Barb. 63; but the judgment which was so treated in each of those cases was taken by confession, and only for the purpose of being used in case the assignment in question should be held invalid; and this fact was held "to connect the judgment and infect it with the vices of the assignment;" the court at the same time saying "that if the judgment and declaration were an independent transaction between the parties they would be valid."

In this case it has been decided already that the notes in question were valid. Some, if not all, of them antedated the mortgages. The judgments taken upon them were obtained in the usual course of adversary procedure in the courts, and there is no reason for saying

that they were not intended to be enforced, as, indeed, according to the averment of the bill, they were to some extent enforced, in the usual way, as if the mortgages had not existed.

There being no fraudulent scheme or design of which the separate mortgages can be said to be only parts, but each mortgage having to be set aside only. because it is in itself obnoxious to legal objection, there is no reason in law or equity why the judgment at law obtained upon any of the notes might not have been executed upon any property of the debtor not embraced in the mortgage given to secure that note. By the statute of this state the equity of redemption in real estate subject to mortgage can in no case be sold on execution upon a judgment at law recovered for the mortgage debt.    Rev. St. 1881, § 1105. It results from this, I suppose, that such a judgment is not a lien upon the mortgaged realty, even after decree in favor of creditors annulling the mortgage, because, as between the parties, the mortgage remains in force notwithstanding the decree.    The same rule, it would seem, must be applied to mortgaged chattels, though the statute on the subject is in terms different.    The execution of a chattel mortgage under the Indiana Code, as well as at common law, vests the title to the chattel and the right of possession at once in the mortgagee, unless in respect to the possession it be otherwise stipulated, (Jones, Ch. Mortg. § 426; *Fay* v. *Burditt*, 81 Ind. 433;) and consequently execution against the mortgagor can be levied upon such property only as authorized by the statute, which requires the levy and sale to be subject to the mortgage.    Rev. St. 1881, § 722.

Subject to these restrictions, I think the decree to be entered should not affect rights of any of the parties, plaintiff or defendant, acquired by taking judgments and executions at law upon their respective demands.    In respect to the liens of judgments, in Indiana, upon lands fraudulently conveyed, see *In re Lowe*, 19 Fed. Rep. 589. In the distribution of such fund as shall be realized after the discharge of liens and priorities acquired by judgments and executions, the defendant creditors of the carriage company, in the judgment of the court, should share *pari passu* with the plaintiffs, and other creditors who have come in, or who may hereafter intervene.    Whatever may be the rule in cases of actual fraud, or when the bill may be and is framed for the sole benefit of the plaintiffs named in it, I am clear that in such a case as this the extent of relief proper to be granted is to cancel the illegal securities, and set aside all liens or priorities acquired thereby, leaving the parties otherwise unaffected in their rights; that is to say, upon an equality in respect to the fund for distribution.

There remains one other question: The First National Bank and the Indiana Banking Company, before the commencement of this action, obtained in the Marion superior court decrees of foreclosure of their respective chattel mortgages, and some of the creditors who have filed intervening petitions in this case since it was referred to

the master, and whose claims upon filing were sent to the master and reported upon by him, were made parties to the foreclosure proceedings and suffered the decree to go against them by default. The records of these decrees were produced before the master in evidence, and are included in his report. It is now insisted that these creditors are estopped by those decrees from denying the validity of the mortgages so foreclosed against them, and consequently cannot, in this case, be permitted to share in the benefits or fund arising from setting those mortgages aside. It cannot well be questioned, and I believe is not seriously disputed, that the decrees referred to would have had this effect if they had been pleaded; but as they were not pleaded, before reference of the intervening petitions to the master, it is insisted that the estoppel is not established or conclusive, and that the court ought not, in its discretion, to permit the filing of the answers which were proposed to be filed after the master's report was made.

It can hardly be said that the parties had a fair opportunity to offer to plead this matter before the reference, which was made without any rule to answer. To say the least, there is nothing in the posture of the case to justify a departure from the usual liberality with which amendments and additional pleadings are allowed. The evidence was adduced before the master at the proper time, and the matter being the record of a decree, conclusive in its effect, the amendment cannot be said to operate as a surprise, or to have an effect which might have been avoided if there had been time to adduce other evidence. The answers are therefore treated as filed, and such creditors as are bound by the decrees referred to must be excluded from sharing in the fund to be distributed, in so far as it results from the setting aside of the mortgages so foreclosed.

Among the intervenors concerned in this question is the firm of Fletcher & Sharpe, composed of four members, only three of whom were made defendants to the action of the Indiana Banking Company to foreclose its mortgage; and for this reason it is contended, and I suppose correctly, that that firm, as such, is not bound by the decree upon that mortgage, and is entitled, in respect to the property covered thereby, to stand on an equality with the plaintiffs and other creditors. There is a provision in the Code of Practice (Rev. St. 1881, § 320) to the effect that in an action against defendants jointly indebted on contract, if summons has been served upon one or more, but not on all, of them, judgment may be taken, which "may be enforced against the joint property of all, and the separate property of the defendant served." But this plainly does not apply to the decrees under consideration, because, though intended to foreclose any claim of right or interest in the mortgaged chattels, they were not based upon any contract or obligation of the firm against which the estoppel is asserted. Decree accordingly.