### BOSWORTH et al. v. JACKSONVILLE NAT. BANK.

#### (Circuit Court of Appeals, Seventh Circuit. November 27, 1894.)

#### No. 176.

1. BILL OF EXCHANGE—EQUITABLE ASSIGNMENT—APPROPRIATION OF FUNDS.

On September 12, 1893, the C. Railway Company drew two drafts in favor of the J. Bank, upon the R. Railway Company for a part of a fund in the hands of that company belonging to said C. Railway Company, which fund, however, would not be payable until September 25th. On September 21st, receivers of the C. Railway Company were appointed, and took possession of its property, including the fund in the hands of the R. Railway Company, which was subsequently paid to them. The J. Bank did not present the drafts for acceptance, or notify the R. Railway Company of their existence, until after the appointment of the receivers, nor did the R. Railway Company ever accept them. *Held*, that the drawing of the drafts did not, without their acceptance, constitute an appropriation of a part of the fund to the payment of the J. Bank, nor an equitable assignment to it of a part of the fund, but that the receivers became entitled to the fund upon their appointment, and it was rightly paid to them.

2. OFFICERS OF CORPORATIONS—DUTIES TOWARDS CREDITORS — ILLEGAL PREFERENCE.

The drafts having been drawn and delivered to the bank in payment of a note of the C. Railway Company, on which H., its president and one of its directors, was surety, and at a time when the railway company was in failing circumstances, *held*, that they constituted an illegal preference to one who, as an officer and member of the corporation, stood in a relation of trust towards its general creditors.

Appeal from the Circuit Court of the United States for the Southern District of Illinois.

This was an intervening petition in the nature of a bill in equity, brought by the Jacksonville National Bank against C. H. Bosworth and E. Ellery Anderson, as receivers of the Chicago, Peoria & St. Louis Railway Company, to obtain payment to the bank of certain funds in the hands of the receivers. In the circuit court a decree was entered for the intervener. Defendants appeal.

This is a suit in equity, brought by the Jacksonville National Bank, as intervener, against the receivers of the Chicago, Peoria & St. Louis Railway Company, to recover the sum of $7,500, being the amount of two several drafts drawn by Marcus Hook, as treasurer of the railway company,—one for the sum of $2,500 and the other for $5,000,—upon W. G. Purdy, treasurer of the Rock Island & Pacific Railway Company, each dated September 12, 1893. These drafts were delivered on the day of their date to the cashier of the bank, with directions that, when paid, the proceeds were to be indorsed upon

a certain note for $10,000 which had theretofore, on July 25, 1893, been executed by the railway company to the bank, with William S. Hook, its president, as surety, for money borrowed by the railway company from the bank, and used to carry on its business. The sum of $2,500 had already been paid by said railway company upon said note, by its check dated September 11, 1893, and these two drafts were intended to pay the balance due upon the said $10,000 note. These drafts were drawn and delivered by the railway company before the appointment of receivers, and, at the time of their delivery, Marcus Hook, the treasurer of the company, notified the bank, through its cashier, that they were drawn under an agreement between the said railway company and the drawees that the traffic balances for the month of August, 1893, in the hands of the Pacific Company, and against which the said drafts were drawn, would not be payable until September 25th following. This fund, not yet due, against which the drafts were drawn by the company, was a balance coming to said company from the drawee, the Chicago, Rock Island & Pacific Railway Company, amounting to $11,550.39, being the freight traffic balance for the month of August, 1893, in the hands of the Pacific Company belonging to the Chicago, Peoria & St. Louis Railway Company. It will be seen from this statement that the drafts, amounting in the aggregate to $7,500, called for only a part of the fund against which they were drawn. They were not presented for payment by the bank until after the receivers were appointed. They were then presented, and payment demanded of the drawee, and refused. Nor until such receivers were appointed was any notice given to the drawee of the possession of the drafts by the bank. Afterwards, on September 27th and November 1st, the money due for such freight balances, and against which the drafts were drawn, was paid by the Pacific Company to the receivers of the Chicago, Peoria & St. Louis Railway Company, the appellants. The claim on the part of the bank is that the drawing of the drafts constituted an appropriation in equity to that extent of the said fund in the hands of the drawee, which gave the bank a lien thereon pro tanto in preference to other creditors, although the said drafts were never accepted or paid by the drawee. The contention on the part of the receivers is that, inasmuch as the drafts were not presented or accepted or the money paid before the railway went into the hands of receivers, and the money was then paid over to the receivers upon demand, no lien attached to the money in the hands of the drawees, and that the receivers hold it as trustees for the benefit of the railway company and its general creditors; that the fund in the hands of the Rock Island & Pacific Company was a single fund and cause of action, and could not be divided and parceled out to different creditors, except by actual payment, or at least by an acceptance which would bind the drawee to pay. The decree of the court below was in favor of the bank.

The following additional facts may be stated, as showing the history of the proceedings which culminated in the bringing of this suit by the bank as intervener and petitioner for the recovery of the amount of these drafts. On December 18, 1890, the Chicago, Peoria & St. Louis Railway entered into possession of the St. Louis & Chicago Railway Company, under a written lease, and continued in possession until about the 22d day of July, 1893. On the 10th day of July, 1893, R. J. Cavett, receiver of the said St. Louis & Chicago Railway, filed a petition in the United States circuit court for the Southern district of Illinois, setting out the lease aforesaid, and alleging material defaults in the performance of the covenants of the same by the said Chicago, Peoria & St. Louis Railway Company; and prayed a surrender of the said St. Louis & Chicago property, a decree for arrears in rent, and for damages. On this, process issued, and the Chicago, Peoria & St. Louis Railway Company appeared August 7, 1893, and demurred thereto. On September 12, 1893, R. J. Cavett, as receiver aforesaid, filed his amended petition against the Chicago, Peoria & St. Louis Railway Company, W. S. Hook, and Marcus Hook, alleging an indebtedness of said defendants to petitioner of $75,000 ; and further alleging the indebtedness of the said Chicago, Peoria & St. Louis Railway Company to many other railroads, corporations, and individuals, and default in bonded interest,—and thereupon prayed that a receiver might be appointed to take possession of the property of said Chicago, Peoria & St. Louis Rail-

way Company. Whereupon an order was entered setting down the above petition, together with the applications of the Woodward & Tiernan Printing Company, the St. Louis & Southeastern Railway Company, and John Coughlin for the appointment of a receiver of the Chicago, Peoria & St. Louis Railway Company, and other companies comprising the "Jacksonville Southeastern Line," for hearing on the 21st day of September, 1893. On September 21, 1893, the Mercantile Trust Company of New York, as trustee, filed its bill in chancery against the Chicago, Peoria & St. Louis Railway Company, in the United States circuit court for the Southern district of Illinois, alleging default in interest on first mortgage bonds, insolvency, and praying for the appointment of a receiver and foreclosure. Afterwards, on September 21, 1893, the court of its own motion entered an order consolidating the applications for the appointment of a receiver of the said Chicago, Peoria & St. Louis Railway Company, filed by R. J. Cavett, the Woodward & Tiernan Printing Company, John M. Coughlin et al., and the St. Louis & Southeastern Railway Company, with the bill of complaint of the Mercantile Trust Company, under the name of "The Mercantile Trust Company, complainant, against the Chicago, Peoria & St. Louis Railway Company, defendant." On the same day, the court entered an order appointing C. H. Bosworth and E. Ellery Anderson receivers of the Chicago, Peoria & St. Louis Railway Company, and of all the other railways comprised in and commonly known as the "Jacksonville Southeastern Line." Pending such application for a receiver, and on the 16th day of September, 1893, Boyd, Stickney & Co. sued out an attachment in the circuit court of Peoria county, Ill., against the Chicago, Peoria & St. Louis Railway Company, on a claim of $5,498.64, and levied the same on two passenger coaches, in addition to garnishing the Chicago, Rock Island & Pacific Railway Company, the Rock Island & Peoria Railway Company, and the Atchison, Topeka & Santa Fé Company, railway corporations indebted to said Chicago, Peoria & St. Louis Railway Company on account of traffic balances. Meanwhile, the Chicago, Peoria & St. Louis Railway Company was indebted to the Jacksonville National Bank, as before stated, in the sum of $10,000, upon the promissory note of July 25, 1893, with William S. Hook as surety. Later the garnishment proceedings of Boyd, Stickney & Co. were dismissed, and the Chicago, Rock Island & Pacific Railway Company paid the receivers of the Chicago, Peoria & St. Louis Company the amount ascertained to be due on the said freight traffic balance. On October 28, 1893, the Chicago, Peoria & St. Louis Railway Company filed its appearance in the consolidated cause of the Mercantile Trust Company against the Chicago, Peoria & St. Louis Railway Company. On December 5, 1893, the demurrer of the Chicago, Peoria & St. Louis Railway Company to the bill of the Mercantile Trust Company came up for hearing, was argued, and the demurrer overruled. In said consolidated cause, on the 18th day of December, 1893, the Jacksonville National Bank filed its intervening petition, alleging the indebtedness of $10,000 to the petitioner by the said Chicago, Peoria & St. Louis Railway Company, evidenced by its promissory note executed July 25, 1893; the drawing of the two drafts above mentioned, by Marcus Hook; the indorsing and delivery of the same to petitioner; that the drafts were drawn on a particular fund, and was an appropriation of the said fund; and praying that the court would order the payment of the said drafts out of the fund mentioned. The receivers of the Chicago, Peoria & St. Louis Railway Company were made defendants, and filed an answer thereto denying the right of the petitioner to the amount claimed. On February 16, 1894, the court entered a decree finding that it was the custom in doing business between the Chicago, Peoria & St. Louis Railway Company and the Chicago, Rock Island & Pacific Railway Company to settle freight balances between the two companies on or about the 25th of each month, and that the officers of the bank were informed of this fact when the drafts were delivered, and that the drafts would be paid on or about the 25th of the month; that it was the intention and purpose in delivering said drafts to have the proceeds applied to the payment of the balance due on said note; and further found that by the said two drafts the Chicago, Peoria & St. Louis Railway Company appropriated the sum of $7,500 of said freight balances to the payment of said $10,000 note, and that the said receivers had no right or title to the same, as such receivers; and the court thereupon ordered the re-

ceivers to pay to the bank, in 20 days from date, the sum of $7,500, with interest; and the receivers thereupon assigned errors and took an appeal to this court from the decree.

Bluford Wilson (Philip Barton Warren, of counsel), for appellants.

Isaac Morrison and Thomas Worthington, for appellee.

Before WOODS and JENKINS, Circuit Judges, and BUNN, District Judge.

BUNN, District Judge (after stating the facts as above). 1. We are of opinion that this case is controlled by the decision of the supreme court of the United States in Mandeville v. Welsh, 5 Wheat. 277. Justice Story in that opinion says:

"It is said that a bill of exchange is, in theory, an assignment to the payee of a debt due from the drawee to the drawer. This is undoubtedly true where the bill has been accepted, whether it be drawn on general funds or a specific fund, and whether the bill be, in its own nature, negotiable or not; for, in such a case, the acceptor, by his assent, binds and appropriates the funds for the use of the payee. * * * In cases, also, where an order is drawn for the whole of a particular fund, it amounts to an equitable assignment of that fund, and, after notice to the drawee, it binds the fund in his hands. But where the order is drawn, either on a general or a particular fund, for a part only, it does not amount to an assignment of that part, or give a lien, as against the drawee, unless he consent to the appropriation, by an acceptance of the draft, or an obligation to accept may be fairly implied from the custom of trade, or the course of business between the parties, as a part of their contract. The reason of this principle is plain. A creditor shall not be permitted to split up a single cause of action into many actions without the assent of the debtor, since it may subject him to many embarrassments and responsibilities not contemplated in his original contract. He has a right to stand upon the singleness of his original contract, and to decline any legal or equitable assignments by which it may be broken into fragments. When he undertakes to pay an integral sum to his creditor, it is no part of his contract that he should be obliged to pay in fractions to any other persons. So that, if the plaintiff could show a partial assignment to the extent of the bills, it would not avail him in support of the present suit."

The case, also, of Palmer v. Merrill, 6 Cush. 282, opinion by Chief Justice Shaw, is very much in point, wherein it was held that an assignment, for a good consideration, from the assured, in a life policy, by an indorsement in writing thereon, of part of the sum assured thereby, notice of which is given to the insurers, but the policy retained in the hands of the assignor, does not transfer to the assignee such an interest in the policy as will entitle him, if the estate of the assured proves insolvent, to recover the whole sum assigned to him of the assured's administrator, who has received the whole amount of the policy from the insurers. This case is quite analogous to the one at bar. The receivers stand in the place of the administrator in the Massachusetts case, and represent, not only an insolvent debtor, but all of its creditors as well, whose rights attached to the fund upon their appointment, and before any appropriation of the portion thereof represented by the drafts had been effected by presentation or acceptance, and even before the fund became due and payable by agreement of the railway companies. It appears from the record, not only that the bank omitted to give the drawee notice of its claim to part of the fund, but received the drafts with knowledge that the fund would not accrue or be available until Sep-

tember 25, 1893, which was four days after the appointment of the receivers; and the only notice that was given by the bank, which was by the presentation of the drafts for payment, was also after the receivers had been appointed, and had notified the drawee of their appointment, and claimed the fund. The decree appointing the receivers clothed them with all the property rights of the company, "together with all tolls, rents, incomes, franchises, issues, and profits, and generally with all the authority and rights usually given to receivers by a court of equity." It is nowhere claimed or asserted that the drawee, prior to the receivership, accepted the drafts, or had notice of their existence, and it would seem that the transaction was treated by the bank as incomplete and unexecuted until the freight balance should be determined upon by the railway company, the drawee. In the meantime, as seems entirely just and equitable, the right of the receivers and the general creditors, whom they represented, had attached to the fund, in preference to that of the creditor who was seeking a preference after the company had become insolvent and its affairs put into course of liquidation.

The following remarks of Chief Justice Shaw in the case last referred to lay down the correct doctrine:

"According to the modern decisions, courts of law recognize the assignment of a chose in action, so far as to vest an equitable interest in the assignee, and authorize him to bring an action in the name of the assignor, and recover a judgment for his own benefit. But, in order to constitute such an assignment, two things must concur: first, the party holding the chose in action must, by some significant act, express his intention that the assignee shall have the debt or right in question, and, according to the nature and circumstances of the case, deliver to the assignee, or to some person for his use, the security, if there be one, bond, deed, note, or written agreement, upon which the debt or chose in action arises; and, secondly, the transfer shall be of the whole and entire debt or obligation in which the chose in action consists, and as far as practicable place the assignee in the condition of the assignor, so as to enable the assignee to recover the full debt due, and to give a good and valid discharge to the party liable."

And the same rule holds in equity. Indeed, the entire doctrine of assignments of choses in action is one growing out of equity jurisprudence, and founded upon equitable considerations, as by common law the legal title to a chose in action could not be passed by assignment; and still, according to the generally accepted doctrine, they are only assignable so far as to vest in the assignee an equitable interest. The doctrine of the above cases was fully recognized and enforced by the supreme court of Illinois in Railway Co. v. Nichols, 57 Ill. 464.

2. As it appears from the record that by the note to the bank for $10,000, of July 25, 1893, William S. Hook, who was president and director of the railway company, bound himself as surety for the payment of the note, the railway company, being in failing circumstances, and already, when the drafts were drawn, a party to proceedings which placed it in the hands of a receiver, could not give a preference to one who, as an officer and member of the corporation, stood in a relation of trust toward the general creditors. It is insisted that the property of an insolvent corporation is a trust fund in such a sense as to preclude the directors and officers of the corpora-

tion from dealing with it in such a manner as to secure preferences for themselves. And this is undoubtedly the general doctrine, and the doctrine in Illinois. See Beach v. Miller, 130 Ill. 162, 22 N. E. 464; Roseboom v. Whittaker, 132 Ill. 81, 23 N. E. 339; Cook, Corp. § 691.

In a recent case decided by this court (Sutton Manuf'g Co. v. Hutchinson, 63 Fed. 496, opinion by Mr. Justice Harlan), the doctrine is thus summed up:

"It is, we think, the result of the cases that when a private corporation is dissolved, or becomes insolvent and determines to discontinue the prosecution of business, its property is thereafter affected by an equitable lien or trust for the benefit of creditors. The duty in such cases of preserving it for creditors rests upon the directors or officers to whom has been committed the authority to control and manage its affairs. Although such directors and officers are not technical trustees, they hold, in respect of the property under their control, a fiduciary relation to creditors; and, necessarily, in the disposition of the property of an insolvent corporation, all creditors are equal in right, unless preference or priority has been legally given by statute or by the act of the corporation to particular creditors. In what cases, where the subject is uncontrolled by legislation, can such preference of priority be legally given by a corporation? Undoubtedly a solvent corporation, if not forbidden by its charter, may mortgage its property to secure the performance of obligations assumed before or at the time of the execution of the mortgage. So, a mortgage executed by a corporation whose debts exceed its assets, to secure a liability incurred by it or on its behalf, will be sustained if it appears to have been given in good faith to keep the corporation upon its feet, and enable it to continue the prosecution of its business. A corporation is not required by any duty it owes to creditors to suspend operations the moment it becomes financially embarrassed, or because it may be doubtful whether the objects of its creation can be attained by further effort upon its part. It is in the line of right and of duty, when attempting, in good faith, by the exercise of its lawful powers and by the use of all legitimate means, to preserve its active existence, and thereby accomplish the objects for which it was created. In such a crisis in its affairs, and to those ends, it may accept financial assistance from one of its directors, and by a mortgage upon its property secure the payment of money then loaned or advanced by him, or in that mode protect him against liability then incurred in its behalf by him. Of course, in cases of that kind a court of equity will closely scrutinize the transaction, and, in a contest between general creditors and a director or managing officer who takes a mortgage upon its property, will hold the latter to clear proof that the mortgage was executed in good faith, and was not a device to enable him to obtain an advantage for himself over those interested in the distribution of the mortgagor's property. Richardson's Ex'r v. Green, 133 U. S. 30, 43, 10 Sup. Ct. 280; Oil Co. v. Marbury, 91 U. S. 587, 588.

"Entirely different considerations come into view when an insolvent corporation having no expectation of continuing its business, and recognizing its financial embarrassments as too serious to be overcome, mortgages its property to secure a debt previously incurred to one of its directors, or, in a general assignment of all of its property, gives him a preference. To a general assignment by a private corporation for the equal benefit of all its creditors, including directors, no objection could be made, because it recognizes the equal right of creditors to participate in the distribution of the common fund. Such an assignment, Lord Ellenborough said, in Pickstock v. Lyster, 3 Maule & S. 371, is to be referred to an act of duty rather than of fraud, and is an act by the assignor that arises out of a discharge of the moral duties attached to his character of debtor to make the fund available for the whole body of creditors. The contention of the defendants is that, in disposing of their respective properties, an individual and a corporation were recognized at common law as having equal rights; and as the former may, in the absence of a statute forbidding it, transfer the whole or part of his property

with the intention or with the effect of giving a preference to some of his creditors, to the exclusion of others, so an insolvent corporation, when financially embarrassed and not intending to continue its business, may make a preference among its creditors, whoever they may be, and whatever their relation to the corporation or to the property transferred. If this be a sound rule, it would follow that directors, being also creditors, of an insolvent corporation which has abandoned the objects of its creation, and ceased an active existence, may distribute among themselves its entire assets, if the reasonable value thereof does not exceed their aggregate demands. We cannot accept this view. In our judgment, when a corporation becomes insolvent, and intends not to prosecute its business, or does not expect to make further effort to accomplish the objects of its creation, its managing officers or directors come under a duty to distribute its property or its proceeds ratably among all creditors, having regard, of course, to valid liens or charges previously placed upon it. Their duty is 'to act up to the end or design' for which the corporation was created (i Bl. Comm. 480); and when they can no longer do so their function is to hold or distribute the property in their hands for the equal benefit of those entitled to it. Because of the existence of this duty in respect to a common fund in their hands to be administered, the law will not permit them, although creditors, to obtain any peculiar advantage for themselves to the prejudice of other creditors. This rule is imperatively demanded by the principle that one who has the possession and control of property for the benefit of others—and surely an insolvent corporation, which has ceased to do business, holds its property for the benefit of creditors—may not dispose of it for his own special advantage to the injury of any of those for whom it is held. That principle pervades the entire law regulating the conduct of those who hold fiduciary relations to others, and, instead of being relaxed, should be rigidly enforced in cases of breach of duty or trust by corporate managers seeking to enrich themselves at the expense of those who have an interest equally with themselves in the property committed by law to their control. It would be difficult to overstate the mischievous results of a contrary rule as applied to those intrusted with the management of corporate property."

That the Chicago, Peoria & St. Louis Railway Company was insolvent when the drafts were drawn, on September 12, 1893, can hardly admit of question. Since July 10, 1893, a suit had been pending against the company, brought by Cavett, receiver of the St. Louis & Chicago Railway, alleging default in performance of covenants in the lease, and asking a surrender of the same. On the 12th of September, the very day the drafts were drawn, Cavett, receiver, filed an amended petition against the Chicago, Peoria & St. Louis Railway Company, William S. Hook, and Marcus Hook, alleging an indebtedness of $75,000 to the petitioner, and also alleging indebtedness to many other railroads, corporations, and individuals, and, among the rest, default in the bonded indebtedness of the defendant company, and asking the appointment of a receiver, and the case was set for hearing on September 21st. On that day, September 21st, the Mercantile Trust Company began the suit for foreclosure upon the bonds of the company for default in the payment of the interest thereby secured falling due on the 1st day of September, 1893. On the same day of the filing of this bill, September 21st, receivers were appointed for the railway company, who, on the morning of September 22d, took possession of the road.

It would be difficult to distinguish this case upon principle from that of the Sutton Manufacturing Company, quoted from as above. There is this difference: that William S. Hook, at the time of the drawing of the drafts, was not a creditor of the railway company

for the amount of its indebtedness to the bank. He was merely surety for the payment of the note. The money was advanced by the bank to the company, and used in its business. The bank, therefore, was primarily the creditor. William S. Hook could only be considered the creditor, in respect to the money represented by the note, after he should pay the note as surety for the railway company, and become subrogated in the place of the bank in respect to the indebtedness. But it seems pretty clear that this difference in Mr. Hook's relation to the railway company, as compared to that of a creditor proper, would make no difference in the application of the rule in regard to giving preferences. This was so adjudged in Lippincott v. Carriage Co., 25 Fed. 577, and in Howe v. Tool Co., 44 Fed. 231, both decided by Judge Woods, and referred to with entire approval in Sutton Manuf'g Co. v. Hutchinson, supra. The intention to make the preference and the motive are manifest from the record. The note did not fall due until September 26th. On September 11th, $2,500 was paid, and indorsed upon it. These drafts for $7,500 were drawn on the next day, September 12th, two weeks before the note would become due, against a fund not yet due, and of a then uncertain amount. There is no reason appearing for singling out this particular debt for such prompt payment except to favor William S. Hook, president, who had signed as a joint and several maker, but who, as between him and the railway company, was surety for the payment of the debt. Was William S. Hook, in preferring the bank, gaining any peculiar advantage to himself to the prejudice of other creditors? We think this question admits of but one answer. The advantage he would gain to himself by such preference would be the cancellation of his own obligation to the bank for the debt, which cancellation would forestall his becoming the creditor of an insolvent corporation. Being surety upon the note to the bank, and liable to be called upon to pay the same, as one of the makers, when due, he would have the same motive, in case of insolvency or threatened insolvency of the company, to prefer the bank as a creditor, as he would to prefer himself as a creditor. There would be the same temptation to fraud and unfair dealing in the one case as in the other.

And upon the whole case we must hold that the preference thus sought to be made of this particular creditor, on the very day of the filing of the amended petition praying for the appointment of a receiver, and after default made in the payment of interest upon the bonded indebtedness of the railway company, was an unlawful preference; and, upon both grounds discussed in this opinion, the decree of the court below is reversed, and the cause remanded, with directions to enter a decree in favor of the appellants.