IDAHO–OREGON LIGHT & POWER CO. et al. v. STATE BANK OF
CHICAGO et al.

PRIEST et al. v. IDAHO RY., LIGHT & POWER CO. et al.

(Circuit Court of Appeals, Ninth Circuit.   July 12, 1915.)

No. 2524.

1. CORPORATIONS ☞471—MORTGAGE BONDS—DELIVERY AFTER DEFAULT.

Where a corporate deed of trust neither expressly nor impliedly pro-
hibited the certification and delivery by the trustee of bonds thereby
authorized after default in the payment of interest on bonds already sold,
bonds were duly and legally certified after such default.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1833–1836,
1838, 1840; Dec. Dig. ☞471.]

2. CORPORATIONS ☞471—MORTGAGE BONDS—ISSUANCE.

Where the full amount of the bonds authorized by a corporate deed of
trust had not been issued, the execution of a second mortgage to secure a
bond issue, the proceeds of which were intended in part to be used in re-
funding the first mortgage bonds, did not prevent the corporation from
thereafter issuing first mortgage bonds; the second mortgage expressly
providing that all bonds issued thereafter were under and pursuant to the
terms of the first mortgage.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1833–1836,
1838, 1840; Dec. Dig. ☞471.]

3. CORPORATIONS ☞471—MORTGAGE BONDS—VALIDITY—SUFFICIENCY OF EVI-
DENCE.

In a suit to foreclose a corporate mortgage, involving a controversy be-
tween two groups of bondholders, evidence *held* to show that the corpora-
tion needed $250,000 at the time it released a syndicate of bankers con-
trolling the corporation from their obligation to purchase second mortgage
bonds in consideration of their agreement to procure a loan to the cor-
poration of $250,000 secured by second mortgage bonds exchangeable for
first mortgage bonds.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1833–1836,
1838, 1840; Dec. Dig. ☞471.]

4. CORPORATIONS ☞473—MORTGAGE BONDS—ISSUANCE OF BONDS—COMMON
DIRECTORATE.

A power company, whose property was covered by a first mortgage
securing bonds, all of which had not been issued, executed a second mort-
gage to secure bonds which it experienced difficulty in selling. A syndi-
cate of bankers agreed to purchase 1,500 of the second mortgage bonds
at 80, taking stock as a bonus, and a railway and power company was
organized, to which certain property was transferred; a majority of the
stockholders of the power company exchanging their stock for stock in
the railway company, which acquired control of the power company and
had its directors and officers made directors and officers of the power
company. When the bankers had taken 1,325 of the bonds, it became
apparent that the power company was in failing circumstances, that its
income was insufficient to meet its current obligations, and that immediate
insolvency could not be escaped, unless by a reorganization or consolida-
tion with a competing company, and subsequent events showed that it was
then hopelessly insolvent. The directors then authorized an agreement
with the bankers, releasing them from their obligation to take the remain-
ing 175 bonds; the bankers agreeing to procure for the corporation a loan
of $250,000, secured by second mortgage bonds to twice the amount of
the loan, exchangeable for first mortgage bonds. *Held* that, while the
power company was authorized to issue the first mortgage bonds so

exchanged for second mortgage bonds, and while it apparently needed $250,000, the act of the directors was constructively fraudulent as to the holders of outstanding first mortgage bonds, and the court properly decreed that the bonds securing such loan should be held only for the amount advanced thereon above the amount which the bankers were owing under their contract to purchase second mortgage bonds.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1842–1853, 1855; Dec. Dig. ☞473.]

5. CORPORATIONS ☞472—MORTGAGE BONDS—ISSUANCE—COMMON DIRECTORATE.

The directors of a corporation, in selling the bonds of their company to raise money for its benefit, act in a fiduciary capacity, and any transaction whereby they become possessed of such securities, in · order to be valid, must in all respects be free from fraud or the suspicion of wrongdoing or unfair dealing.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1839, 1841; Dec. Dig. ☞472.]

6. CORPORATIONS ☞472—MORTGAGE BONDS—ISSUANCE—COMMON DIRECTORATE.

A power company, controlled by a railway company, had outstanding a first mortgage, all of the bonds authorized by which had not been issued, and a second mortgage. It was indebted to contractors, who were willing to take $20,000 in first mortgage bonds at the then selling price; but the common directors of the two companies arranged a settlement by which the railway company was to deliver to the contractors second mortgage bonds of the power company and its own stock, agreeing to purchase the bonds at a specified price after a date fixed, and the power company agreed to deliver first mortgage bonds to the railway company in exchange for second mortgage bonds. *Held* that, as it did not appear that the stock and bonds so surrendered to the contractors by the railway company were of any value, and there was therefore no proof that the railway company parted with anything of value, it had no substantial equities with respect to first mortgage bonds received by it under this arrangement.

[Ed. Note.—For other cases, see Corporations, · Cent. Dig. §§ 1837, 1839, 1841; Dec. Dig. ☞472.

Identity of governing officers or agents in different corporations as affecting the transactions thereof, see note to Marks v. Merrill Paper Co., 123 C. C. A. 385.]

Appeal and Cross-Appeal from the District Court of the United States for the Southern Division of the District of Idaho; Frank S. Dietrich, Judge.

Suit by the State Bank of Chicago against the Idaho-Oregon Light & Power Company and others, in which A. W. Priest and others, personally and as a bondholders' committee, intervened. From a decree (219 Fed. 583), the interveners and certain defendants appeal. Affirmed.

On or about April 1, 1907, the Idaho-Oregon Light & Power Company, hereinafter named the Power Company, executed to the State Bank of Chicago, as trustee, a mortgage upon all of its property, consisting chiefly of hydro-electric power plants and power and light distributing systems in Idaho and Oregon, to secure an issue of 7,000 bonds, of the par value of $7,000,000. Of that issue, $3,319,000 in bonds were thereafter certified and were outstanding. In the fall of 1911 the Power Company, having already expended large sums of money upon its Ox Bow plant on the Snake river, from which it expected to procure its power, was in need of funds for the completion thereof. On or about November 21, 1910, it executed a second mortgage on the properties cov-

ered by the first, to secure a bond issue of $10,000,000. A portion of the money expected to be realized thereon was to be used in refunding the first mortgage bonds, and $3,000,000 of it was intended to be used for the completion of the Ox Bow plant. Difficulty having been met in selling the second mortgage bonds, a scheme of reorganization was devised. On September 19, 1911, the banking house of Kissel, Kinnicutt & Co., with the co-operation of other capitalists in New York City, called in the record the bankers, entered into an agreement to purchase $1,500,000 of the second mortgage bonds at 80, and to take as a bonus a large portion of the capital stock of the company, together with certain options and privileges. To carry out their plans, the Idaho Railway, Light & Power Company, hereinafter named the Railway Company, was organized, and to it were transferred one of the Power Company's power plants and certain electric railway lines and lighting systems, and in exchange for the railway company's stock and bonds there were transferred to it all the bonds and stock of the Power Company in the agreement above referred to, and the majority of the stockholders of the Power Company exchanged their stock in that company for stock in the Railway Company. The Railway Company thereby acquired control of the Power Company, and the directors and officers of the Railway Company were made the directors and officers of the Power Company, and by January 1, 1912, the Power Company had passed into the complete control of the Railway Company. The trustee of the first mortgage brought a suit to foreclose. In that suit intervened A. W. Priest and his associate interveners, constituting a bondholders' committee, which, at the time of the intervention, controlled about 400 of the first mortgage bonds, and at the time of the hearing represented 2,000 of the bonds. The interveners sought at first to prevent foreclosure on the ground that the Railway Company, which had obtained control of the Power Company, was promoting the foreclosure for the purpose of wrecking the latter, to the injury of the holders of first mortgage bonds, who had no corresponding interest in the Railway Company. The interveners alleged that in the early part of 1913 the Railway Company was in possession of and claimed to own certain of the second mortgage bonds of the Power Company, and demanded of the Power Company that it receive back these bonds and deliver to the Railway Company an equal amount of first mortgage bonds, being part of the $3,319,000 of said bonds alleged to be outstanding, and the Power Company, being under the control and domination of the Railway Company necessarily acceded to the demand, and delivered to the Railway Company $718,000 of the first mortgage bonds, and the interveners alleged that the second mortgage bonds had no market value, and were worthless, and that the exchange was without consideration, and was as to the interveners and the Power Company wrongful and fraudulent, and that the said bonds should be canceled.

Cavanah, Blake & MacLane and Alfred A. Fraser, all of Boise, Idaho (John F. MacLane, of Boise, Idaho, of counsel), for appellants.

Eldon Bisbee, of New York City, Amicus Curiæ, in support of appellants.

Joseph Cummins, of Chicago, Ill., and Richards & Haga, of Boise, Idaho, for appellees and cross-appellants Priest and others.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

GILBERT, Circuit Judge (after stating the facts as above). [1] The controversy in the court below concerned the disposition of 825 of the first mortgage bonds claimed to be owned by the Railway Company. Its right to hold 107 of those bonds was attacked on the ground that the certification of the trustee and delivery of the same to the Power Company were unauthorized under the terms of the trust deed, in that they were certified and delivered after default in the payment of an installment of interest due on the bonds already

sold. There is no prohibition in the trust deed against issuing the bonds under those circumstances, and such a prohibition is not fairly to be implied from its terms. We find no error in the conclusion which the court below reached upon that branch of the case; the court ruling that those bonds were duly and legally certified, and delivered as collateral, and were held by the Railway Company as collateral, and reserving the right to determine the status, title, and ownership of those bonds in another proceeding. The remainder of the 825 bonds in controversy were issued in two groups, one of 440 and one of 278, in September and December, respectively, 1912.

By September, 1912, Kissel, Kinnicutt & Co. with their associates, who were in control of the Railway Company, had taken over 1,325 of the 1,500 second mortgage bonds which they had agreed to purchase. They were still under obligation to take the remaining 175 at the stipulated price of $140,000. On September 25, 1912, a meeting of the directors of the Power Company and the Railway Company was held in New York. A resolution was adopted under which a written agreement was executed between Kissel, Kinnicutt & Co. and the Power Company and Mainland Bros. of Oshkosh, who formerly had dominated the Power Company. That agreement referred to the contract of the year before, recited that 175 of the bonds then agreed to be taken were still to be purchased; that Kissel, Kinnicutt & Co. were ready to complete their purchase, but were unwilling thereafter to take any additional bonds under their option; that the Power Company would, in the course of six months, need $250,000; that Kissel, Kinnicutt & Co. had offered to procure for the Power Company a loan of that amount in consideration of their being released from the obligation to take the remaining 175 second mortgage bonds; and that the Power Company had accepted the offer. Whereupon it was agreed that Kissel, Kinnicutt & Co. would procure a loan of $250,000, $100,000 of which was to be furnished immediately, and the remainder at any time within six months upon demand, the loan to be secured by the second mortgage bonds of the Power Company, equal at their face value to twice the amount of the loan, for which loan the Power Company was to sign a note, which should be due and payable at any time upon default of the payment of interest on any of the outstanding bonds of the company, or upon commencement of proceedings against it for the appointment of a receiver. The agreement further stipulated that the Power Company at any time upon demand of the Railway Company would exchange its first mortgage bonds up to $500,000 for an equivalent amount of its second mortgage bonds so held by the Railway Company. Following that agreement, $220,000 was furnished to the Power Company by the Railway Company, and 440 of the second mortgage bonds were turned over to the Railway Company as collateral. Thereafter an equal amount of the first mortgage bonds was substituted as collateral.

As to the 278 bonds, the facts are briefly as follows: In December, 1912, the Power Company desired to settle with Bates & Rogers, a construction company which had a contract for work on the Ox Bow plant. That settlement was consummated at a meeting of the executive

committee of the Power Company held in New York. According to the records, Bates & Rogers were to receive in the settlement 25 of the second mortgage bonds and 50 shares of the preferred stock and 100 shares of the common stock of the Railway Company, and that company's promise to buy from them within 60 days after May 29, 1914, the 25 bonds at 80 and accrued interest. The records show that the Power Company and the Railway Company ratified this arrangement, and in consideration of the Railway Company's agreement to deliver to Bates & Rogers 100 shares of its common stock and 50 shares of its preferred stock, and its promise to buy the bonds on May 29, 1914, at 80, the Power Company agreed that it would, upon demand of the Railway Company, deliver its first mortgage bonds up to $500,000, face value, in exchange for second mortgage bonds, and in carrying out that agreement 278 of the bonds were delivered by the Power Company to the Railway Company.

The trial court concluded that the Railway Company should be recognized as having an equity in the group of 440 bonds corresponding to the consideration paid out, of which the Power Company had received the benefit, and ordered an accounting for the purpose of determining the extent of its equity, and upon such accounting found that the Railway Company had advanced $250,000, and no more, for which it was entitled to credit, and that from that amount should be deducted the $140,000 due the Power Company under the original contract, and that it be decreed an equitable lien upon the 440 first mortgage bonds for the balance of $110,000, with interest, and that it be decreed the right to receive the 175 second mortgage bonds contracted for. As to the Bates & Rogers transaction, the court held that it was not shown by the record that the Railway Company had parted with anything of value on account thereof, or has any substantial equities in the premises.

It is the contention of the appellants that the interveners' bill cannot be maintained, for the reasons that the transactions by which the Railway Company acquired the 825 bonds were at most voidable, and that the interveners have no right to avoid them on grounds available to the company, namely, want of proper corporate authorization, the common directorate of the Power and Railway Companies, and lack of benefit to the Power Company; that neither that company, nor its stockholders, nor any person in privity with it, was injured by the transactions, and that that company, its privies and successors in interest, have ratified the same, or are estopped to avoid them, and that the suit, regarded in the light of a proceeding by bondholders to cancel alleged fraudulent bonds as prejudicial to their own right to distribution, or on the ground of preference to directors, must fail, because the interveners expressly contracted for such use of the bonds in controversy, and received every consideration upon which they could be so used; that it was not illegal for the directors to prefer themselves, that the interveners have not objected to the transaction on the ground of preference, and that the said bonds did not give a preference but participation; and it is finally contended that, in any view of the case, the appellants are entitled to hold the 718 bonds as security for $250,000 and interest, and $20,000 on account of the settlement with Bates & Rogers.

[2] There can be no question of the authority of the Power Company to issue under the first mortgage the bonds which are in controversy here. The total amount of bonds permissible under that mortgage was $7,000,000. At the time when the second mortgage was made, the outstanding bonds under the first mortgage were $2,799,000. The second mortgage expressly provided that all bonds issued thereafter are under and pursuant to the terms of the first mortgage. In the leading case of Claflin v. South Carolina R. Co. (C. C.) 8 Fed. 118, Mr. Chief Justice Waite said:

"The mortgages provide for the security of the particular bonds they describe, and the company puts the bonds out from time to time as occasion requires. When a dealer finds such bonds not yet due in the hands of the company, with the proper certificate of the mortgage trustee upon them, it has, I think, always been understood in the commercial world that he might buy in good faith with safety. The security has been considered a continuing one, and the bonds negotiable by the company, so as to carry the mortgage security until they have become commercially dishonored, or something else has been done to deprive the company of its power of putting them out. In my opinion a subsequent mortgage is not sufficient for this purpose, unless it in terms limits the lien of the prior mortgage to bonds actually out and provides against reissues."

[3] Nor do we find that the evidence, fairly considered, sustains the charge that in September, 1912, the company was not in need of a sum so large as $250,000, or that in default of the money which was owing it from the bankers under their contract to purchase bonds it was unnecessary to borrow $250,000. Markhus, the general manager of the Power Company, prepared on September 1st of that year a memorandum for the "purpose of showing the cash required for the last four months of 1912," in which were specified in detail the cash on hand, the estimated cash receipts for that period, the money needed for construction which was then contemplated, also money needed to pay interest on bonds at $95,176, and showing that the cash deficit for those four months would be $203,180. The minutes of the meeting of September 25, 1912, recite that Mr. Watson, the manager director at New York, made a statement of the financial condition of the company, and recommended that $250,000 be raised to meet the requirements of the company "for the next seven months." Watson's testimony, given in November, 1913, states that, as he remembered it:

"We were being pressed for moneys for the corporate purposes of the company, and the necessity that we had to provide money for making extensions and buying electrical apparatus, etc., to handle our business. * * * We had a financial program that required that sum of money. I don't remember in detail."

[4] But while the Power Company was authorized to issue the bonds under the first mortgage, and while that company apparently was in need of the full sum of $250,000, the question remains: What are the equities of the Railway Company in those bonds, in view of the circumstances under which it acquired them? It appears that the appellants conceded in the court below that on September 25, 1912, the directors of the Railway Company had come to the conclusion that the Power Company could not go on with its business, and that the course then inaugurated and subsequently pursued was adopted by the di-

rectors for the purpose of protecting themselves, "as they had a right to do." On the appeal the amicus curiæ takes the position that the insolvency of the Power Company at that time was neither alleged by the interveners nor proven on the trial. It is true that there is in the record no direct or positive testimony that at any time in the year 1912 the directors of the Power Company admitted its insolvency, or that they then contemplated immediate insolvency; but there is sufficient to show that the company, to their knowledge, was in financial embarrassment and in failing circumstances, that its income was insufficient to meet its obligations and current expenses, and that, in view of the competition which was presented, its directors saw no way of escape from immediate insolvency, unless by a scheme of reorganization or possible consolidation with the competing company. The competition so referred to was that of the Beaver River Power Company, which had obtained its franchise and built its line to Boise City, and in the fall of 1912 had entered into contracts with consumers under which, by December of that year, it began furnishing power at about 40 per cent. lower than the existing rate of the Idaho-Oregon Company. Watson testified that there was a great deal of uncertainty at that time as to what the company's future was to be in connection with competition that was staring it in the face, and that he felt that there was uncertainty about the company being able to keep going, "in view of the competition and everything." Another director of the company, called by the interveners, testified that his understanding of the need of the $250,000 at that time was that it was simply to keep the company going, and that a part of it was for debts already incurred; that they understood that they needed the money, and that, if they did not get it, they would fail—fail at once. Subsequent events proved that in September, 1912, the Power Company was hopelessly insolvent.

[5] The directors of a corporation, in selling the bonds of their company to raise money for its benefit, act in a fiduciary capacity, and any transaction whereby they become possessed of such securities, in order to be valid, must in all respects be free from fraud or the suspicion of wrongdoing or unfair dealing on their part. In Twin-Lick Oil Co. v. Marbury, 91 U. S. 588, 589, 23 L. Ed. 328, Mr. Justice Miller said:

"That a director of a joint-stock corporation occupies one of those fiduciary relations where his dealings with the subject-matter of his trust or agency, and with the beneficiary or party whose interest is confided to his care, is viewed with jealousy by the courts, and may be set aside on slight grounds, is a doctrine founded on the soundest morality, and which has received the clearest recognition in this court and in others."

While the directors of a corporation are not trustees for bondholders in the sense that they are trustees for stockholders, it does not follow that bondholders shall be denied protection against the acts of directors, the intention and effect of which is to depreciate the bonds, contrary to the terms of the mortgage under which they are issued. The first mortgage in this case conveyed to the trustee all property, real and personal, and all rights, franchises, and privileges, of the Power Company which it then owned, and which it might thereafter acquire. The

interveners here could not, of course, object to the action of the directors of the Power Company in issuing bonds under the first mortgage up to the full amount permitted thereby, so long as the proceeds were used in the ordinary course of the business of the corporation and in constructing and equipping its plant. On September 25, 1912, the bankers were under obligation to purchase from the Power Company certain second mortgage bonds for the sum of $140,000. They were released from that obligation by the agreement made on that date under which they were to procure the Railway Company to loan $250,000 to the Power Company. Under the circumstances disclosed in the record, the act of the directors was at least constructively fraudulent as to the bondholders, and it was one which the latter had the right to impeach.

This is not the case of security given for money advanced only to keep the corporation a going concern. Back of the transaction and affecting its bona fides is the release of the bankers from an obligation under which the Power Company was entitled to realize $140,-000. The right to relief in such a case is not limited to the corporation or its stockholders. It extends to creditors, both secured and unsecured, and it is held that contracts made by directors who represent opposing interests, while not void ab initio, are "voidable in a proper proceeding taken for that purpose by the corporation, its shareholders, or its creditors." 10 Cyc. 791; Richardson v. Green, 133 U. S. 30, 10 Sup. Ct. 280, 33 L. Ed. 516.

In Thomas v. Brownville & R. R. Co., 109 U. S. 522, 3 Sup. Ct. 315, 27 L. Ed. 1018, the court said:

"Such contracts are not absolutely void, but are voidable at the election of the parties affected by the fraud."

In McGourkey v. Toledo & Ohio Railway, 146 U. S. 536, 566, 13 Sup. Ct. 170, 180, 36 L. Ed. 1079, the court said:

"A contract of this kind is clearly voidable at the election of the corporation; and when such corporation is represented by the directors against whom the imputation is made, and the scheme was in reality directed against the mortgagees, and had for its very object the impairment of their security by the withdrawal of the property purchased from the lien of their mortgage, it would be manifestly unjust to deny their competency to impeach the transaction. The principle itself would be of no value if the very party whose rights were sacrificed were denied the benefit of it."

See, also, Consolidated Tank Line Co. v. Kansas City Varnish Co. (C. C.) 45 Fed. 7; Bosworth v. National Bank, 64 Fed. 615, 12 C. C. A. 331.

It is but equitable, and it was within the power of the court below to decree, and we think it properly did decree, that the first mortgage bonds transferred to the Railway Company as collateral be held only for the sum of money thereupon advanced over and above the amount which the bankers were then owing under their contract to purchase second mortgage bonds.

[6] The court below, in considering the equities of the Railway Company in the bonds which were taken in settlement of the contract with Bates & Rogers, subjected the question of those equities to fur-

ther examination, and afforded the Railway Company an opportunity to adduce testimony to sustain them, and thereafter, upon consideration of the fact that no additional evidence had been offered, decided upon the record that the Railway Company had parted with nothing of value on account of that settlement, and had no substantial equities in the premises. We are not convinced that there was error in that conclusion. Bates & Rogers stood ready to adjust their claim upon the payment to them of $20,000. They were willing to take in payment first mortgage bonds of the Power Company at the then selling price. But the manager of that company, who was also a director of the Railway Company, refused to give first mortgage bonds, because he said:

"Their claim was not good against a company that ought to be in the hands of a receiver."

The result was that Bates & Rogers received in settlement of their claim second mortgage bonds of the face value of $25,000, 50 shares of the preferred and 100 shares of the common stock of the Railway Company, and its promise, unsecured, to purchase from them within 60 days from May 29, 1914, the $25,000 bonds at 80 and accrued interest. In consideration of that undertaking on the part of the Railway Company, it eventually acquired from the Power Company the 278 first mortgage bonds in controversy. The record does not show that the stock and second mortgage bonds so surrendered to Bates & Rogers by the Railway Company for the benefit of the Power Company were of any value, and, such being the case, it was not error to hold, as the court below did, that there was no proof that the Railway Company had parted with anything of value in that transaction, or that it had in equity a lien upon the 278 first mortgage bonds.

We find no error. The decree is affirmed.