### STATE BANK OF CHICAGO v. IDAHO-OREGON LIGHT & POWER CO. et al. (PRIEST et al., Interveners).

(District Court, D. Idaho, S. D.   August 24, 1914.)

1. CORPORATIONS ☞545—INSOLVENCY—ILLEGAL ISSUE OF BONDS—FRAUD OF DIRECTORS.

Practically all of the stock of a power company was acquired by another electric company, called the railway company, organized for the purpose, under a contract by which it agreed to buy $1,500,000 of second mortgage bonds of the power company. The railway company caused its own officers and directors to be elected officers and directors of the power company and from that time wholly controlled its affairs. The power company then had outstanding a part of an authorized issue of first mortgage bonds. Afterward, through a series of agreements between the boards of directors of the two companies, the power company released the railway company from its obligation to buy a part of the second mortgage bonds which had not yet been taken, and instead obtained a loan from that company which it secured by depositing as collateral twice the amount in its first mortgage bonds, and also agreed to exchange a large amount in such bonds for second mortgage bonds held by the railway company of the same par value. At that time both companies were insolvent and the second mortgage bonds of the power company were practically worthless. The power company was not and could not have been benefited by such transactions. *Held*, that in making such contracts the directors of the power company were chargeable with a breach of trust, their evident purpose being to secure for themselves and those associated with them in the railway company an illegal preference over other creditors of the power company; that the first mortgage bonds so obtained would not be permitted to participate with those of other holders in the assets of the power company beyond an amount sufficient to cover the money actually advanced to the power company under the contract, deducting therefrom the amount which the railway company was obligated by its prior contract to pay for second mortgage bonds.

[Ed. Note.– For other cases, see Corporations, Cent. Dig. §§ 2170–2175; Dec. Dig. ☞545.]

2. CORPORATIONS ☞473—INSOLVENCY—RIGHTS OF BONDHOLDERS.

The rights of bondholders of a corporation are not measured strictly by the terms of the bonds and mortgage after the corporation has become insolvent, but they are entitled to contest the validity of other bonds, issued after insolvency, which would otherwise share with them in the distribution of assets.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1842–1853, 1855; Dec. Dig. ☞473.]

In Equity. Suit by the State Bank of Chicago, trustee, against the Idaho-Oregon Light & Power Company, the Bankers' Trust Company, and F. N. B. Close, in which A. W. Priest and others intervene.

On petition of interveners contesting the right of certain bonds to participate in distribution of assets. Decision for interveners.

E. E. Prussing, of Chicago, Ill., and Sullivan & Sullivan, of Boise, Idaho, for plaintiff.

Cavanah, Blake & MacLane, of Boise, Idaho, for defendants Idaho-Oregon Light & Power Co. and Idaho Ry., Light & Power Co.

A. A. Fraser, of Boise, Idaho, for defendant Idaho Ry., Light & Power Co.

Perky & Crow, of Boise, Idaho, for defendants Bankers' Trust Co. and F. N. B. Close.

Joseph Cummins, of Chicago, Ill., and Richards & Haga, of Boise, Idaho, for interveners.

Eldon Bisbee, of New York City, amicus curiæ.

DIETRICH, District Judge. This suit was brought by the plaintiff, as trustee, to foreclose a trust deed given by the defendant Idaho-Oregon Light & Power Company, hereinafter called the "Power Company," upon all of its property, consisting chiefly of hydroelectric power plants and power and light distributing systems in Idaho and Oregon, to secure an issue of 7,000 bonds of the par value of $1,000 each, of which 3,319 have been certified and are apparently outstanding. The defendants Bankers' Trust Company and F. N. B. Close are the trustees named in a second trust deed given to secure a large issue of bonds referred to in the record as the second or consolidated bonds, of which about $1,800,000 are outstanding. A. W. Priest and his associate interveners are the several owners of first mortgage bonds, and constitute a bondholders' committee, controlling approximately 400 of the first mortgage bonds at the time of the intervention, and 2,000 at the time of the hearing. The present controversy involves the status of 825 of the remaining bonds of this issue, which are claimed by the Idaho Railway, Light & Power Company (hereinafter referred to as the "Railway Company"), and arises in this way: A short time before the decree was entered foreclosing the first mortgage, the Priest committee sought to intervene, with the object of preventing foreclosure, upon the ground that the Railway Company, which had control of the Power Company, was promoting the foreclosure as a means of wrecking the Power Company, greatly to the injury of the holders of first mortgage bonds who had no corresponding interest in the Railway Company. While the decree of foreclosure was not delayed, it was entered with certain reservations, in harmony with which the Priest committee was permitted to intervene for the purpose, among others, of opposing the recognition of the right of the bonds held by the Railway Company to share in the distribution of the proceeds of the sale of the property. For reasons which it is not necessary here to state, the foreclosure sale has been postponed from time to time, and, it being the desire of all parties that the rights of the Railway Company upon distribution be determined without further delay, a hearing was had upon the complaint in intervention and the answer thereto filed by the Railway Company. (In compliance with an order of the court, the Power Company has

also answered; but, in view of its insolvency and its subserviency to the Railway Company, its position in the controversy is without importance.) It thus appears that while in form the Priest committee has taken the initiative, the proceeding is in anticipation of the foreclosure sale and the distribution of the proceeds thereof; and, considering the substance only, the controversy is to be deemed to be one arising after the sale, with the Railway Company seeking an order distributing to it a proportionate share of the proceeds of the property, and the Priest committee, as bondholders, resisting, upon the grounds set forth in their complaint in intervention. It is upon the assumption that such is the real nature of the proceeding that, for the convenience of the parties, and in deference to their desire, the issue is determined at the present time. It should be added that all parties have assumed that a sale and reorganization are inevitable, and that it is wholly improbable that the proceeds will be sufficient to pay in full the first mortgage bonds outstanding, aside from those presently involved.

1. The only question now raised touching 107 of the bonds is whether their certification by the trustee and delivery to the Power Company were authorized under the terms of the trust deed; the point being that they were certified and delivered after default in the payment of an installment of interest due upon the bonds already sold, namely, all the other bonds now outstanding. There is nothing in the trust deed either expressly or by fair implication prohibiting such action, and I am unable to see how any principle of right or justice was violated. It was shown by the trustee, and is not now denied, that the Power Company had made the improvements and expenditures upon its property required by the trust deed, and that all other conditions precedent prescribed therein had been performed. The objection is therefore thought to be without substantial merit.

From the answer of the Power Company and some of the evidence it would appear that these bonds are held by the Railway Company only as collateral, but by agreement of the parties the question of the nature and extent of its right or title is excluded from consideration, and the order or judgment herein will be without prejudice to its determination in another proceeding.

[1] 2. We come now to the 718 bonds. Conceding that they were all properly certified and delivered to the Power Company, the interveners object that the Railway Company should be denied participation in the distribution by reason of the fact that, through its control of the Power Company, it could and did wrongfully and without consideration procure possession thereof. Two transactions are involved, one in September, 1912, by which the Railway Company got possession of 440 of the bonds, and the other in December of the same year, by which it procured the other 278. The inquiry having taken a wide range, the evidence is too voluminous to be reviewed in detail, and I shall content myself with stating only such facts as will make reasonably clear the conclusions I have reached. Prior to the fall of 1911 the Power Company was under independent management, and owned most of the properties of which it is now possessed. The principal source

from which it expected to procure its power was the Ox Bow plant on the Snake river, and this was still incomplete and unproductive, although, according to the books of the company, sums aggregating approximately $2,000,000 had been spent in promoting and developing it. It being impracticable under the terms of the first trust deed to issue more than $2,000,000 of the bonds for this purpose, a new instrument was executed, called the "consolidated mortgage," securing a large issue of bonds, $7,000,000 of which, or such part thereof as might be necessary, were to be used in refunding the first mortgage bonds, and $3,000,000 for the completion of the Ox Bow plant, and the construction of necessary transmission lines, and for other corporate purposes. At this time the Power Company was dominated by Mainland Bros., of Oshkosh, Wis., who, finding that the second bonds were not readily salable upon the market, succeeded in enlisting in an elaborate scheme of reorganization and enlargement, the co-operation of a group of capitalists in New York City, represented by the banking house of Kissel, Kinnicutt & Co., who entered into an agreement to purchase $1,500,000 of the consolidated mortgage bonds at .80, taking as a bonus a large proportion of the capital stock of the company, with certain other options and privileges, some of which will be referred to later. Thereupon, pursuant to the plan agreed upon, the Railway Company was organized, and to it were transferred the Swan Falls power plant and various electric railway lines and lighting systems, all new acquisitions, situated in southwestern Idaho within the general territory served by the Power Company. There were also transferred to it, in exchange for its stock and bonds, all the bonds and stock of the Power Company covered by the contract above referred to; and the Mainlands, as well as most of the other stockholders of the Power Company, exchanged their stock for stock in the Railway Company, thus giving to the Railway Company complete control of the Power Company. In due time the directors and officers of the Railway Company were elected directors and officers of the Power Company, and undoubtedly from that time on, namely, from about the 1st of January, 1912, the Power Company was completely dominated by the Railway Company.

By September, 1912, Kissel, Kinnicutt & Co., who it is apparent were acting upon behalf of and as the representative of the Railway Company, or, perhaps more accurately, of the syndicate controlling the Railway Company, had taken over 1,325 of the 1,500 bonds they had agreed to purchase; they were still under obligation to take the other 175, which, at the stipulated price, would amount to $140,000. At this time it is clear they had reached the conclusion that the Power Company was hopelessly insolvent, as was undoubtedly the case, and that their contract to purchase was ill advised, and their original plan could not be profitably carried out. Further reorganization of some character, and sacrifice in one quarter or another, was doubtless thought to be inevitable.

Such being the situation, on the 25th of September a meeting of the directors was held in New York City, at which the Railway Company claims the contract was authorized under which it later got pos-

session of the 440 bonds. Eight of the eleven directors were present. Aside from the consideration that the directors were all elected by the Railway Company, and the Railway Company was in actual fact dominated by the Kissel-Kinnicutt syndicate, it is extremely doubtful whether what was done at this meeting could in fact or in law be deemed to be a corporate act. But in view of the essential character of the action which purports to have been taken, and of the nature of substantially the only legal ground upon which the Railway Company contends the interveners must fail, a detailed discussion of this phase of the inquiry is thought to be unnecessary. In harmony with the apparent action taken at the meeting, a written agreement was immediately executed; the formal parties thereto being Kissel, Kinnicutt & Co., designated as the "Bankers," the Power Company, and the Mainlands. Referring to the original Kissel-Kinnicutt contract of September 19, 1911, the instrument recites that 1,325 of the bonds had been taken over, and that there were still 175 to be purchased; that Kissel, Kinnicutt & Co. were ready to complete their purchase, but were unwilling to take additional bonds under their option; that the Power Company would, in the course of six months, need $250,000; and that Kissel, Kinnicutt & Co. offered to procure for the Power Company a loan of this amount, in consideration of their being released from the obligation to take the other 175 bonds; and that the Power Company had accepted this offer. Thereupon follows an agreement to the effect that the "Bankers" would procure the Railway Company (which in reality was wholly insolvent) to make the loan of $250,000, at 6 per cent. interest, $100,000 to be furnished immediately and the balance at any time within six months upon demand of the Power Company, the loan to be secured by the first mortgage bonds of the Power Company, equal at their face value to twice the amount of the loan. The Power Company was to sign a note containing, among others, a provision that it might be declared due and payable at any time upon default of the payment of interest upon any of the outstanding bonds of the company, or upon the commencement of proceedings against it for the appointment of a receiver. The agreement contained the further extraordinary provision obligating the Power Company at any time upon demand of the Railway Company to exchange its first mortgage bonds, up to $500,000, for an equivalent amount of its second mortgage bonds held by the Railway Company.

That under the circumstances such an agreement was thought by any one to be in the interest of the Power Company is wholly incredible. I cannot believe that an independent board of directors would have given to it a moment's consideration. The company needed money, it is true; but, if it was going on with the Ox Bow development, the sum contracted for was wholly inadequate for any useful purpose, and, if the work at that point were not to be resumed, there was no urgent need for so large an amount. Those who participated in the transaction are unable to give any reasonable explanation of the purposes for which the $250,000 were to be used, and apparently there is none. The company had available on demand $140,000, due

upon the Kissel-Kinnicutt contract, and surely both upon the market and in fact its first mortgage bonds were worth in excess of 50 cents on the dollar, the basis upon which they were to be hypothecated to procure the loan. Under the conditions created by the agreement, the possibility that there ever would be a redemption was so remote as to be negligible. The transaction therefore practically amounted to a sale of between $200,000 and $500,000 face value of the first mortgage bonds for an equivalent amount of seconds, which it is apparent must have been wholly valueless if the firsts were worth less than their face, and the surrender, without any real consideration, of the obligation of the syndicate to take $175,000 face value of the seconds at 80. There is but one rational explanation of the agreement, and that is that the interests in control of the Railway Company, and, through it, of the Power Company, having concluded that the latter was hopelessly insolvent, and that a reorganization was inevitable and a receivership probable, resorted to this expedient for saving to themselves as much of the wreckage as possible. Putting aside for the moment all question of the rights of these interveners, it is plain that there was a breach of trust on the part of the officers of the Power Company and a disregard of the rights of the holders of approximately $166,000 face value of the consolidated bonds which had been sold upon the market and were held by the general public, who therefore would be prejudiced by the issuance of first bonds in exchange for the consolidated or seconds.

Upon behalf of the syndicate interests, it is suggested that they had put into the enterprise a large amount of money, through the purchase of the consolidated bonds, which were practically worthless, and for that reason they were entitled to a measure of protection at the hands of the Power Company. Assuming that they were entitled to sympathy, it does not follow that they were entitled to protection. Their misfortune in no wise enlarged their rights as parties to the contract, or abated their duty as trustees of the Power Company. As directors, they were bound to subserve the interests of the company, and to hold its property for the common benefit of its creditors, and they were not privileged to strip it of its meager remaining resources for the purpose of recouping their private losses. The adoption of any other view would necessarily be to recognize the rule of might, and to say to him to take who can. Moreover, were the consideration suggested deemed to be a material one, it is to be noted that the original contract of September 19th was not a simple contract for the purchase of a stated number of bonds; it embraces an ambitious scheme of great possible profit to the purchasers. They do not occupy the position of one who has bought worthless securities with no expectation of gain other than a fair interest return. They bargained for the chance of the profit of a speculative enterprise, and they must have contemplated the risk of loss as well as the chance of gain. To refer to only one feature of the agreement: They had the option to require the retirement of all the first mortgage bonds, which were to be called at a premium, and such were the conditions that by acquiring these bonds, as it was doubtless within their power to a great extent to do, they

could, at an actual outlay of probably not to exceed 60 per cent. of their face value, secure a large part of the consolidated bonds, which, upon the retirement of the firsts, would constitute a prior lien upon all the property of the company.

What followed the execution of the agreement is not made entirely clear, but apparently at different times money aggregating $220,000 was furnished to the Power Company, ostensibly by the Railway Company, and later bonds, in installments of various amounts, aggregating $440,000 face value, were turned over to the Railway Company as collateral. Notwithstanding the fact that under the agreement the Power Company was to exchange 500 firsts for seconds only in case firsts were available for that purpose, shortly after the hypothecation of the 440 firsts as collateral, they were exchanged for an equivalent number of seconds, which were substituted as collateral, and the firsts were deposited as collateral with the Railway Company's creditors or their trustee. It will be understood, of course, that in speaking of a transfer of possession between the two companies a constructive transfer only is meant, for both had the same secretary and treasurer, as well as other officers.

The facts touching the remaining 278 bonds may be more briefly stated. In the fall of 1912 the Power Company desired to make a settlement and terminate its relations with Bates & Rogers, a construction company having a contract for work on the Ox Bow plant. According to the records, the settlement was consummated at a meeting of the executive committee of the Power Company held in New York City on December 27th. What actually occurred at this meeting is open to serious doubt; but, assuming that what purports to be the record is genuine and speaks truly, an agreement was reached with Bates & Rogers by which, in part consideration to them for a complete settlement, they were to receive $25,000 face value of the Power Company's consolidated bonds, 50 shares of the preferred, and 100 shares of the common stock of the Railway Company, and its obligation (unsecured) to purchase from them within 60 days after the 29th of May, 1914, the $25,000 bonds at 80 and accrued interest. Thereupon, such is the record, the Power Company and the Railway Company proceeded to ratify this arrangement, and in consideration of the Railway Company's agreement to deliver to Bates & Rogers 100 shares of its common stock, which was worthless, and its obligation to buy the bonds, which, because of its insolvency, if for no other reason, was unenforceable and hence practically of no value, the Power Company was made to agree that it would, upon the demand of the Railway Company, deliver its first mortgage bonds up to $500,000 face value (the same to be in excess of those covered by the September contract) in exchange for consolidated bonds, which also were without substantial value. From the testimony and the surrounding circumstances, no doubt is left in my mind that the Power Company could have made settlement directly with Bates & Rogers with its first mortgage bonds at a comparatively small discount, and that the devious course was adopted not upon their demand or for the interest of the Power Company, or because of any necessity therefor, but for

the sole purpose of furnishing a pretext for getting the first mortgage bonds out of the treasury of the Power Company and into the hands of the Railway Company, and for the interest alone of those by whom the latter company was dominated.

[2] Relying upon the rule that the contract of a corporation with its directors, or touching a matter in which they are interested, is not absolutely void, but only voidable, the Railway Company urges with much apparent confidence that the interveners must fail because, as mere bondholders, they have no such right or interest as entitles them to attack the transactions in question. Its position is, that their rights are measured solely by the terms of the bonds and the trust deed securing the same, and that no provision of these instruments has been violated; that, such being the case, it is a matter of no legal concern to them how it procured the bonds, and they would have no standing to call into question a gift or even a theft thereof; that, if any wrong has been done, it can be remedied only upon the demand of the corporation, or, in case of its inaction, of its stockholders.

It may be conceded that as a general rule the creditor of a solvent corporation, be he secured or unsecured, has no legal right to complain of the improvident disposition of its property. But it must not be forgotten that here the corporation was insolvent, and those whose duty as trustees it was fairly and honestly to administer its affairs, undertook to prefer themselves. An insolvent corporation cannot rightfully give away its property in fraud of its creditors, neither can it legitimately prefer the claims of its officers and stockholders. In Jackson v. Ludeling, 88 U. S. (21 Wall.) 616, 22 L. Ed. 492, a suit in equity brought by bondholders against the directors of the debtor corporation, attacking the validity of a judicial sale of its property, at which the directors became the purchasers, the court said:

"They (the directors) had no right to enter into or participate in a combination, the object of which was to divest the company of its property and obtain it for themselves at a sacrifice, or at the lowest price possible. They had no right to seek their own profit at the expense of the company, its stockholders, or even its bondholders. Such a course was forbidden by their relation to the company. It was their duty, to the extent of their power, to secure for all those whose interests were in their charge the highest possible price for the property which could be obtained for it at the sheriff's sale. They could not rightfully place themselves in a position in which their interests became adverse to those of either the stockholders or bondholders. * * * The defendants can take nothing from such a sale, thus made. Were we to sustain it, we should sanction a great moral and legal wrong, giving encouragement to faithlessness to trusts, and confidence reposed, and countenance combinations to wrest by the forms of law from the uninformed and confiding their just rights."

In Wabash, St. L. & P. Ry. Co. v. Ham, 114 U. S. 587, 594, 5 Sup. Ct. 1081, 1084, 29 L. Ed. 235, it was said:

"The property of a corporation is doubtless a trust fund for the payment of its debts, in the sense that, when the corporation is lawfully dissolved and all its business wound up, or when it is insolvent, all its creditors are entitled in equity to have their debts paid out of the corporate property before any distribution thereof among the stockholders. It is also true, in the case of a corporation, as in that of a natural person, that any conveyance

of property of the debtor, without authority of law, and in fraud of existing creditors, is void as against them."

By Woods, J., it was said in Lippincott v. Shaw Carriage Co. (C. C.) 25 Fed. 577, 586, that:

"While it is generally conceded that a corporation, notwithstanding insolvency, continues possessed of a general power of management of its affairs, and like natural persons may give preferences by way of payment or security to one creditor or class of creditors over others; yet, in close analogy to the rule which forbids the giving of preferences by individual debtors for the purpose of securing, or in such manner as to secure, advantage or benefit to themselves, and in manifest accord with the tendency of judicial opinion as expressed upon consideration of kindred questions, it has been decided in a number of cases that preferences given by insolvent corporations in such manner as to be of special benefit to the directors or managing agents, or any of them, will be set aside. This, as it seems to me, is the salutary rule, and the only rule which can be administered with uniformity and fairness."

And most pertinent is the language used by the same judge in Howe, Brown & Co. v. Sanford Fork & Tool Co. (C. C.) 44 Fed. 231, 233, where he said:

"It seems to me enough to say that a sound public policy and a sense of common fairness forbid that the directors or managing agents of a business corporation, when disaster has befallen or threatens the enterprise, shall be permitted to convert their powers of management and their intimate, and it may be exclusive, knowledge of the corporate affairs into means of self-protection to the harm of other creditors. They ought not to be competitors in a contest of which they must be the judges. The necessity for this limitation upon the right to give preferences among creditors when asserted by corporations may not have been perceived in earlier times, but the growing importance and variety of modern corporate enterprises and interests I think will compel its recognition and adoption. The fact in this case that the stockholders authorized the making of the mortgage seems to be immaterial. That action was, it is averred, procured by the directors proposed to be benefited, they, themselves, being stockholders; and, even if this were not averred, the case would not, I think, be essentially different. Whether or not such preferences are fairly given is an impracticable inquiry, because there can be in ordinary cases no means of discovering the truth; and consequently the presumption to the contrary should in every case be conclusive. Concede that it is a question of proof, and that a preference in favor of a director will be deemed valid if fairly given, and it may as well be declared to be a part of the law of corporations that in cases of insolvency debts to directors and liabilities in which they have a special interest must be first discharged. That will be the practical effect, and the examples will multiply of individual enterprises prosecuted under the guise of corporate organization, for the purpose, not only of escaping the ordinary risks of business done in the owner's name, which may be legitimate enough, but of enabling the promoters and managers, when failure comes, to appropriate the remains of the wreck by declaring themselves favored creditors. Besides inconsistency with that equality which equity loves, such favors involve too many possibilities of dishonesty and successful fraud to be tolerated in an enlightened system of jurisprudence."

See, also, Sweeney v. Grape Sugar Co., 30 W. Va. 443, 4 S. E. 431, 8 Am. St. Rep. 88, and Richardson v. Green, 133 U. S. 30, 10 Sup. Ct. 280, 33 L. Ed. 516.

It is a mistake to assume that the interveners contracted only for certain security and that all their rightful demands were satisfied when

it was properly certified that the requisite expenditures and improvements had been made. They contracted for security, it is true, but primarily they contracted for payment, and the continuing obligation of the Power Company was to pay its bonds in accordance with their terms. The interveners were creditors of the company, not merely claimants of a share in a disputed fund. Upon entering into .the contract they had the right to assume that the business of the company would be conducted, if not wisely, at least fairly and honestly. At the time these transactions took place, the Power Company was wholly insolvent, and for that reason its stockholders, even had they been free to act upon its behalf, had no incentive to exercise vigilance or to take any action for the protection of its interests. In short, the corporation had wholly lost the protection of its natural guardians. As was said by the Supreme Court of West Virginia in Sweeney v. Grape Sugar Co., supra:

"In the case of a corporation which is wholly insolvent and unable to continue its business, neither the corporation itself nor its stockholders have any beneficial interest in its property, and therefore they cannot be affected by the fraud. In such case the creditors alone can be affected, and they alone have any interest in avoiding the contracts."

It will not do to say that the bondholders represented by the interveners had no rights which they were entitled to have safeguarded. Their claims being inadequately secured, they would ultimately be compelled to look for payment in full to the general assets of their debtor. Moreover, they were entitled to have their mortgage securities maintained as well as created. From what fund the certified expenditures on account of capital were made does not appear, but that for the protection of their security they were interested in having these bonds honestly used for the benefit of the estate becomes apparent when the fact is noted that, as shown by the record here, preferential claims for labor and supplies for the maintenance and operation of the property, aggregating an amount relatively of great magnitude, are being pressed for allowance, in at least one of which the Railway Company itself is interested, and which, if established, will substantially reduce the value of the interveners' security. These and other considerations strongly persuade me to the view that, in response to the prayer of the interveners in a plenary suit, a court of equity could have properly interfered to prevent the illegal diversion of the bonds, or could now decree their restoration. But it is not necessary to go so far; we have here no plenary suit in which creditors are seeking affirmative relief for themselves or the restoration of property to the corporation. The Railway Company is in reality the actor. It is not content with what it was thus wrongfully able to acquire through its control of the Power Company. It is dependent upon, and is here invoking, the assistance of a court of equity to make actually available to it the fruits of its wrongdoing. Through the trustee, it seeks a foreclosure of the security of the bonds and an order distributing to it a proportionate share of the proceeds of the property. It is asking the court to aid it in enforcing contracts the possession of which it obtained in a manner violative of sound prin-

ciples of public policy and of good morals, and in that view it is quite unimportant whether the interveners would have any standing as plaintiffs in an independent suit. Regardless of who objects or whether any one objects, a court will not knowingly assist a party to reap the fruits of his wrongdoing, and under the rule the Railway Company must be denied the relief which it seeks.

Upon its behalf it is urged that even in this view it should be recognized as having an equity in the bonds corresponding to the consideration it has paid out, of which the Power Company received the benefit, and to this extent it is thought its contention should be sustained. The Power Company is entitled only to be protected against loss, and not to be enabled to reap a profit from the attempted wrong; in so far as may be possible, there should be a restoration of that which it has received. Upon this branch of the case, however, I am inclined to think the record is incomplete, and further evidence will have to be taken, unless the facts can be stipulated. To what extent the receiver will be able to return in specie the stocks and securities which presumably the Railway Company turned over in exchange for the bonds does not appear, nor is there such a statement of account between the Railway Company and the syndicate upon the one side and the Power Company on the other that I can intelligently ascertain the amount for which the Railway Company should be awarded an equitable lien upon the bonds. Nor is there any definite information touching the present status of the Bates & Rogers affair. While the 440 bonds acquired under the agreement of September 25th are apparently not held as collateral under the first provision of the contract, but by virtue of an exchange under a later provision, and, strictly speaking, are therefore technically subject to no other equity than the obligation to return the exchanged consolidated bonds, which are already in the possession of the Railway Company as collateral, I shall regard the substance rather than the form, and accordingly the moneys actually advanced to the Power Company under the contract of September 25th will be charged against the bonds, such advances to be first subject to a deduction of such amount, if any, as remains of the $140,000 due under the original contract of September 19, 1911, after satisfying therefrom any other claims for advances made to the Power Company properly chargeable against that obligation. It is not improbable that the accounting and other information required for such purpose will more or less directly relate to the issue of the Railway Company's interest in the 107 bonds, and both matters can proceed together. However that may be, it is my desire that the evidence upon both branches of the controversy be taken and submitted without unnecessary delay. Presumably the facts are largely within the knowledge of the Railway Company, and it will be required to take the affirmative in establishing such equities as it claims. The receiver is authorized to participate in so far as, upon the advice of counsel, he may deem it to be necessary for the protection of the estate.