## HEIM v. JOBES.[*]

(Circuit Court of Appeals, Eighth Circuit. June 9, 1926.)

No. 7138.

**1. Corporations ⊛⇒316(1).**

Contract of person controlling corporation, with such corporation, will be upheld only where consideration was adequate and terms of contract were fair to corporation.

**2. Corporations ⊛⇒316(1).**

Contract with insolvent corporation by person in control, whereby such person received first mortgage bonds in exchange for worthless second mortgage bonds, *held* invalid as subversive of best interests of corporation.

**3. Corporations ⊛⇒545(2).**

Officers and directors of solvent corporation must not use its assets to prefer themselves as creditors to prejudice of other general creditors.

**4. Corporations ⊛⇒545(2).**

Retired officer and director of corporation at time corporation was in failing circumstances *held* not entitled to preference pursuant to scheme devised at time he was in active control.

[*]Rehearing denied October 11, 1926.

Appeal from the District Court of the United States for the District of Kansas; John C. Pollock, Judge.

Ancillary suit by Harry C. Jobes, as receiver of the Kansas City, Kaw Valley & Western Railway Company against Joseph J. Heim. Decree for plaintiff, and defendant appeals. Affirmed.

George L. Edwards, of Kansas City, Mo. (Henry L. Jost, of Kansas City, Mo., on the brief), for appellant.

William C. Michaels, of Kansas City, Mo. (Albert L. Berger, of Kansas City, Kan., and Haff, Meservey, Michaels, Blackmar & Newkirk, of Kansas City, Mo., on the brief), for appellee.

Before SANBORN and LEWIS, Circuit Judges, and PHILLIPS, District Judge.

PHILLIPS, District Judge. On July 18, 1924, Harry C. Jobes was appointed, by the United States District Court for the District of Kansas, as receiver of the Kansas City, Kaw Valley & Western Railway Company (hereinafter called the Kaw Valley Company). On January 3, 1925, Jobes, as such receiver, brought this ancillary suit against Joseph Heim to set aside a contract entered into between the Kaw Valley Company and Heim, under which first mortgage bonds of the Kaw Valley Company of the face value of $224,000 were delivered to Heim in exchange for second mortgage bonds of the face value of $212,500 and defaulted second mortgage interest coupons of the face value of $47,565, and for the recovery of $6,720 interest paid to Heim on such first mortgage bonds. There was a decree for the receiver granting the relief prayed for, and Heim has appealed therefrom.

The Kaw Valley Company is a Kansas corporation owning and operating an electric interurban railway extending from Kansas City, Kan., to Lawrence, Kan. The construction of the road was begun in 1913. Heim organized two corporations, the Kaw Construction Company and the Kaw Valley Company. Heim and one W. R. Taylor furnished the money to construct the railroad. It was constructed by the Kaw Construction Company. The Kaw Valley Company issued its bonds and stock in payment for the construction of the road. The Kaw Construction Company assigned to Heim the right to receive such bonds and stock, and they were turned over to Heim from time to time as the building of the road progressed. The first mortgage bonds were sold to the public, by Heim, through Otis & Co., at 95.

Prior to the transaction in question, the Kaw Valley Company had issued and outstanding in the hands of the public first mortgage bonds of the face value of $846,000 and second mortgage bonds of the face value of $528,500. The first mortgage bonds were to mature August 1, 1924. Heim owned second mortgage bonds of the face value of $418,500. Taylor and K. D. Klemm owned certain of the second mortgage bonds and certain matured second mortgage interest coupons. Klemm was the son-in-law of Heim. The outstanding common stock of the Kaw Valley Company aggregated 7,405 shares. Of these, Heim owned 5,409, Klemm 1,152, and Taylor 839. The other five shares were issued, one each, to O. U. Claflin, Jr., J. D. Waters, J. E. Rockwell, W. E. Barnhart, and Adolph Meyer, as qualifying shares, in order that they might act as directors.

Under the provisions of the deed of trust securing the first mortgage bond issue, the Kaw Valley Company was authorized to issue additional first mortgage bonds on account of additions and betterments. Under such provisions, the Kaw Valley Company had issued additional first mortgage bonds of the face value of $224,000. These bonds, when issued, were placed in the treasury of the Kaw Valley Company, and there remained until the transaction in question.

At an adjourned meeting of the stockholders of the Kaw Valley Company, held July 13, 1923, Heim, Klemm, Taylor, Claflin, Waters, Rockwell, and Barnhart were elected directors. On the same day the new board of directors met and elected Heim chairman of the board, Klemm president, Taylor first vice president and general manager, Claflin second vice president, Barnhart secretary treasurer, and Heim, Klemm, and Taylor members of the executive committee.

On March 6, 1924, the board of directors of the Kaw Valley Company held a meeting pursuant to a waiver of notice signed by all of the directors. This waiver of notice contained the following recitals of the purposes of the meeting:

"1. Of ordering and directing the payment of interest on second mortgage bonds as same is due up to date of August 1, 1923.

"(2) For the purpose of considering the question of the retirement of a part of the second mortgage bonds of the Kansas City, Kaw Valley & Western Railway Company."

Klemm presided at this special meeting. The minutes of the meeting recited that an offer had been made to purchase first mortgage bonds of the Kaw Valley Company of

the face value of $224,000, then held in the treasury of the company, at 92½ cents on the dollar. A motion was made by Waters, seconded by Claflin, and duly carried, that such first mortgage bonds be disposed of for cash at 92½, and that the proceeds be applied as follows:

"That a sufficient sum realized from the sale thereof be used to pay the interest due to August 1, 1923, on the outstanding second mortgage bonds of the company, and that the balance of the sum realized for the sale of said bonds be used to retire the second mortgage bonds of the company."

The motion was unanimously adopted by the vote of all the directors present.

On March 25, 1924, the regular annual meeting of the stockholders of the Kaw Valley Company was convened. It was adjourned to April 3, 1924. On the latter date, the meeting was again convened, and a new board of directors was elected. The only change in the directorate was the omission of Heim and the election of Adolph Meyer in his stead. Meyer was then and had been for 20 years past a clerk in Heim's office. On April 3, 1924, the new board met, elected Klemm president, Taylor first vice president and general manager, Claflin second vice president, Barnhart secretary treasurer, and Klemm, Taylor, and Claflin members of the executive committee.

For many years prior to 1923, the Outer Belt Railroad Company (hereinafter called the Outer Belt Company) had owned rights of way for terminal facilities starting at the Missouri River and running generally in a southwesterly direction to the Kaw River at the western city limits of Kansas City, Kan., and thence southeasterly to a junction with the Kansas City Terminal Railway Company and the Kansas City Southern Railway Terminal System. Heim purchased the Outer Belt Company properties from its receiver, paying therefor $330,500. He then organized the Kansas & Missouri Railway & Terminal Company (hereinafter called the Terminal Company) to take over the Outer Belt Company properties. These properties had been purchased for Heim in the name of Emil Metschan. On June 15, 1923, Metschan entered into a contract with the Terminal Company, whereby such properties were to be transferred to the Terminal Company in exchange for stock and bonds of the latter company, as follows: common stock of the par value of $962,000, preferred stock of the par value of $481,000, and first mortgage bonds of the face value of $379,000. On the same day, Metschan, the Ter-

minal Company, and the Kaw Valley Company entered into a contract whereby Metschan agreed to assign to the Kaw Valley Company the stock and bonds to be received by him from the Terminal Company. As a part of this agreement, the Kaw Valley Company in turn agreed to pay Heim the actual cost and carrying charges expended by Heim for the Outer Belt Company properties.

On June 30, 1923, the Terminal Company, the Kaw Valley Company, and the Kansas City Southern Railway Company (hereinafter called the Southern Company) entered into a contract by which one-half of the stock and bonds to be issued by the Terminal Company was sold to the Southern Company. Under this contract, the Southern Company and the Kaw Valley Company agreed to advance in equal shares all sums necessary to be expended for additions and betterments to the properties of the Terminal Company. The estimated cost of the stock and bonds of the Terminal Company was $388,636.24. The estimated cost of the additions and betterments was $421,000. New bonds of the Terminal Company in the sum of $421,000 were to be issued to the Kaw Valley Company and the Southern Company to cover the cost of such additions and betterments. The Southern Company paid to Heim, under this contract for one-half of the stock and bonds of the Terminal Company, the sum of $194,318.12.

At no time between June 15, 1923, and May 13, 1924, had the Kaw Valley Company been able either to pay Heim for one-half of the stock and bonds of the Terminal Company or to advance its one-half of the cost of such additions and betterments. On May 13, 1924, a special meeting of the board of directors of the Kaw Valley Company was held pursuant to a waiver of notice. The waiver of notice recited that one purpose of the meeting should be to consider the relationship and transaction of business between the Kaw Valley Company and Heim in the matter of the purchase and payment for the stock and bonds of the Terminal Company and the question of contracts between the parties in regard thereto.

This meeting was held, and the contract, which the receiver seeks to set aside, was authorized. This contract recited the purchase of the Outer Belt properties by Heim, the contracts of June 15, 1923, the contract of June 30, 1923, and supplemental contracts of February 28, 1924, and March 17, 1924, which provided for a change in the

stock and bonds to be issued by the Terminal Company. It further recited that:

"6. Third party (Kaw Valley Company) has long been and is still unable to pay as contemplated and agreed, or even now, first party (Heim) for the securities of the Terminal Company provided to be issued and sold to third party by second party (Metschan) acting for first party, pursuant to the contracts above mentioned, except the sum of $194,318.12, paid by the Kansas City Southern Railway Company pursuant to the contract between that company and another, dated the 30th day of June, 1923, and herein described, and third party has requested first party to further indulge it in the matter of paying for said securities and which first party has agreed to do upon the following terms and conditions."

The contract then provided that first mortgage bonds of the face value of $224,000 should be sold to Heim at 92½, and that out of the proceeds thereof the Kaw Valley Company should pay the interest due Heim on second mortgage bonds up to August 1, 1923, and the balance in redemption of second mortgage bonds held by Heim at 75 cents on the dollar. The contract further provided that the Kaw Valley Company should have six months within which to pay the balance due Heim upon the stock and bonds of the Terminal Company, and, unless it did so within such six months' period, it no longer should have any right, title, or interest of any kind in or to such stock and bonds, and that the contracts for the purchase thereof by the Kaw Valley Company should terminate and be canceled. This contract was executed. Heim gave his check in payment of the first mortgage bonds, and received such bonds. With the proceeds of this check and the sum of $260 in its treasury, the Kaw Valley Company paid $47,565 of defaulted interest coupons of second mortgage bonds, and retired second mortgage bonds of the face value of $212,500. Klemm and Taylor participated in this transaction. Klemm received $15,000 and Taylor $18,000 for their interest in second mortgage bonds and coupons retired and, paid. Heim received the balance.

The above transaction took place May 28, 1924. In the year 1923, a hard surface road was completed between Kansas City and Lawrence, paralleling the line of the Kaw Valley Company. From July, 1923, on, competition from bus lines decreased very materially the earnings of the Kaw Valley Company. In the month of April, 1924, first mortgage bonds of the face value of $3,000 were sold on the open market at 55. The second mortgage bonds had no market and were valueless. On May 28, 1924, the Kaw Valley Company had made no arrangements to refund its first mortgage bonds about to mature, and Heim knew there was little possibility of its being able to do so. It was then unable to meet its current obligations and was insolvent. Klemm admitted in his testimony at the trial below that it was insolvent as early as June, 1924. On July 15, 1924, an application for the appointment of a receiver for the Kaw Valley Company was filed. The bill of complaint was prepared by Claflin, counsel for the Kaw Valley Company, and submitted to and approved by Mr. George L. Edwards, counsel for Heim.

The contentions of counsel for Heim are: First, that the contract was valid; and, second, if the contract was invalid, that the transaction was at most a preference, and that the corporation had a right to prefer Heim at a time when he was neither an officer nor a director of the corporation.

[1] Was the contract valid? One who owns the majority of the stock of a corporation and who dominates and controls such corporation may contract with the corporation, and such contract will be upheld where the consideration moving to the corporation is adequate, where the terms of the contract are fair to the corporation, and where the contract will further the best interests of the corporation. But a court of equity will hold such majority stockholder to the observance of the highest rectitude in dealing with the corporation, and, where the contract is unfair or unconscionable, where the consideration is inadequate, or where the contract is not for the best interests of the corporation but subserves the selfish purpose of such stockholder, it will set aside such contract at the instance of the corporation or its minority stockholders. Mumford et al. v. Ecuador Development Co. et al. (C. C.) 111 F. 639, 643; Meeker et al. v. Winthrop Iron Co. et al. (C. C.) 17 F. 48, 50, 51; Ervin et al. v. Oregon Ry. & Nav. Co. et al. (C. C.) 20 F. 577, 579, 580; Id. (C. C.) 27 F. 625, 632; Rogers v. Nashville, C. & St. L. Ry. Co. et al. (C. C. A. 6) 91 F. 299, 311–314, 33 C. C. A. 517; Rothchild v. Memphis & C. R. Co. et al. (C. C. A. 6) 113 F. 476, 479–481, 51 C. C. A. 310; Stebbins et al. v. Michigan Wheelbarrow & Truck Co. et al. (C. C. A. 6) 212 F. 19, 28, 129 C. C. A. 471; Pennsylvania Canal Co. et al. v. Brown et al. (C. C. A. 3) 235 F. 669, 684, 149 C. C. A. 89; Hyams v. Calumet & Hecla Mining Co. et al. (C. C. A. 6)

221 F. 529, 537, 137 C. C. A. 239; Jones v. Missouri-Edison Electric Co. et al. (C. C. A. 8) 144 F. 765, 771–775, 75 C. C. A. 631; Wheeler v. Abilene Natl. Bank Bldg. Co. (C. C. A. 8) 159 F. 391, 393–395, 89 C. C. A. 477, 16 L. R. A. (N. S.) 892, 14 Ann. Cas. 917; Gamble v. Queens C. W. Co., 123 N. Y. 91, 99, 25 N. E. 201, 9 L. R. A. 527; Heffern Co-op. Consol. G. M. & M. Co. v. Gauthier, 22 Ariz. 67, 193 P. 1021; note 16 L. R. A. (N. S.) 898; Fletcher Cyclopedia Corporations, vol. 6, § 3973, 4035; 14 C. J. p. 870, § 1330.

In Wheeler v. Abilene National Bank Bldg. Co., supra, Judge Sanborn stated the relation and duties of a majority stockholder to the corporation and to the minority stockholders, as follows:

"The holder of the majority of the stock of a corporation has the power, by the election of biddable directors and by the vote of his stock, to do everything that the corporation can do. His power to control and direct the action of the corporation places him in its shoes, and constitutes him the actual, if not the technical, trustee for the holders of the minority of the stock. He draws to himself and uses all the powers of the corporation. In effect he holds an irrevocable power of attorney from the minority stockholders to manage and to sell the property of the corporation, for himself and for them. Times, places, and notices of meetings of the directors and of meetings of stockholders become of secondary importance, because the presence, the vote, and the protest of holders of the minority of the stock are unavailing against the will of the holder of the majority. They can act and contract regarding the corporate property, they can preserve and protect their interests in it, only through him and through the courts.

"This devolution of unlimited power imposes on a single holder of the majority of the stock a correlative duty, the duty of a fiduciary or agent, to the holders of the minority of the stock, who can act only through him, the duty to exercise good faith, care, and diligence to make the property of the corporation produce the largest possible amount, to protect the interests of the holders of the minority of the stock, and to secure and pay over to them their just proportion of the income and of the proceeds of the corporate property. Any sale of the property of the corporation by him to himself for less than he could obtain for it from another, or any other act in his interest to the detriment of the holders of the minority

14 F.(2d)—3

of the stock, becomes a breach of duty and of trust, renders the sale or act voidable at the election of the minority stockholders, and invokes plenary relief from a court of chancery."

In Heffern Co-op. Consol. Gold M. & M. Co. v. Gauthier, supra, the court said:

"There is a prevailing idea with a great many men that majority shareholders of a corporation can conduct the business affairs of the corporation as they see fit. That is not so. While in a narrow and restricted sense it cannot be said that the holder of the majority of the stock of the corporation occupies a relation of trust, yet it can be said in a larger and broader sense that he occupies a fiduciary relation to the holders of the minority stock and the corporation, who can only act through him. In the broader sense the holder of the majority of the stock owes to the other stockholders and the corporation the duty to exercise good faith, care, and diligence to conserve the property of the corporation and to protect the interests of the minority stockholders, and any act of his, in dealing with the property of the corporation, in violation of this duty, for his own selfish interests and gain, will not and cannot be recognized. Majority shareholders can no more, for their own benefit and advantage, appropriate the property of the corporation, than the minority shareholders, and, where the act is in itself a violation of the duty that arises from their fiduciary relation, the corporation can rescind that act."

[2] Under the contract in question, the Kaw Valley Company in effect paid for a six months' option on bonds and securities of the Terminal Company to cost approximately $195,000, first mortgage bonds of the Kaw Valley Company of the face value of $224,000 and of the market value of 55 cents on the dollar at a time when it had little hope, if any, of being able to take up the option. It was the consummation of a scheme devised and approved by the board of directors on March 6, 1924, at a time when Heim was chairman of the board, when Klemm, son-in-law of Heim, was president, and when Heim owned the major portion of the outstanding stock of, and absolutely controlled and dominated, the Kaw Valley Company. The reasonable, natural, and logical conclusion from the evidence is that the resignation and retirement of Heim as an officer and director, the making of the contract authorized by the new board of directors on May 13, 1924, and the provision for the extension of the option to the Kaw Valley

Company, were for the express purpose of clothing with apparent legality a trust violating scheme, devised at a time when Heim was yet an officer and director of the corporation, through which Heim was to receive first mortgage bonds of the face value of $224,000 in exchange for worthless second mortgage bonds and interest coupons, and through which Klemm and Taylor were to receive $33,000 in cash for their interest in worthless second mortgage bonds and interest coupons. It was a contract by self-serving trustees for their individual benefit at the expense and to the damage of their cestuis que trust and without adequate consideration—a contract which was subversive of the best interests of the corporation and was actuated by the selfish desire of Heim, Klemm, and Taylor to accomplish their own gain at the expense of the corporation, its minority stockholders and creditors. We conclude that the contract was invalid.

[3] Did the Kaw Valley Company, acting through its officers and directors, have the right to prefer Heim, Klemm, and Taylor as its creditors? The Kaw Valley Company was insolvent when the second mortgage bonds and coupons were paid. The great weight of judicial authority supports the rule that, where a corporation is insolvent, its officers and directors must not use the assets of the corporation to prefer themselves as creditors to the prejudice of other general creditors. Stuart v. Larson et al. (C. C. A. 8) 298 F. 223, 38 A. L. R. 79; In re Lamie Chemical Co. (C. C. A. 4) 296 F. 24, 30, 31; Drury v. Cross, 7 Wall. (74 U. S.) 299, 19 L. Ed. 40; State Bank of Chicago v. Idaho-Oregon L. & P. Co. (D. C.) 219 F. 583, 590, 591; Id. (C. C. A.) 224 F. 39; In re Salvator Brewing Co. (D. C.) 183 F. 910; Asheville Lbr. Co. v. Hyde (C. C.) 172 F. 730; Wyman v. Bowman (C. C. A. 8) 127 F. 257, 273, 274, 62 C. C. A. 189; Northwestern Mutual L. Ins. Co. v. Cotton Exchange Real Estate Co. (C. C.) 70 F. 155, 159–161; Bosworth v. Jacksonville National Bank (C. C. A. 7) 64 F. 615, 12 C. C. A. 331; Sutton Mfg. Co. v. Hutchinson (C. C. A. 7) 63 F. 496, 11 C. C. A. 320; Fletcher Cyclopedia Corporations, vol. 8, § 5145, p. 8753; 14A C. J. p. 901, § 3080. This rule is founded upon the principle that it is inequitable that a director, whose position affords him knowledge of the condition of the corporation and power to act for it, should be permitted to take advantage thereof and protect his own claim to the detriment of others, at a time when it is apparent that all the unsecured debts of the corporation cannot be fully paid. Fletcher Cyclopedia Corporations, vol. 8, p. 8756; Harle-Haas Drug Co. v. Rogers Drug Co. et al., 19 Wyo. 35, 113 P. 791, Ann. Cas. 1913E, 181, 187.

In Stuart v. Larson, supra, Judge Kenyon, speaking for this court, said:

"The great weight of authority in this country is that the directors of an insolvent corporation, who are also creditors thereof, have no right to grant themselves preferences or advantages in the payment of their claims over other creditors, and such rule is merely applied common honesty. A director occupies a certain fiduciary position toward the stockholders and the creditors. He has better facilities for knowing the condition of the company than have the other creditors, and he ought not to be permitted to use that position to benefit himself at their expense."

Klemm and Taylor were officers and directors, and under the rule above stated clearly had no right to prefer themselves as creditors of the corporation.

[4] Counsel for Heim assert, however, that, because of the fact that he was not an officer or director of the corporation at the time the payments were made, the corporation had the legal right to prefer him as its creditor. With this contention we cannot agree. An officer, director, and majority stockholder of a corporation, realizing that the corporation is in failing circumstances, cannot be a party to the devising of a scheme to prefer himself and other officers and directors, thereupon resign and retire as an officer and director of the corporation, and thereby legalize a preference to him, resulting from the execution of such scheme. Rokker v. J. W. Butler Paper Co., 88 Ill. App. 278; Nixon v. Goodwin, 3 Cal. App. 358, 85 P. 169; Mallory v. Kirkpatrick, 54 N. J. Eq. 50, 33 A. 205; City National Bank v. Goshen Woolen Mills Co., 35 Ind. App. 562, 69 N. E. 206. It is the peculiar province of a court of equity to look through the form to the substance, to penetrate such a subterfuge, and to discover the actual transaction stripped of all its disguise. Heim's position was in fact no different than if the preference had been given while he was yet a director and officer. The payment to him was within the rule above stated, and cannot be sustained upon the theory that it was a valid preference.

The decree below was right, and it is affirmed.